TROTTER AND HARRIS *v*. STATE.

5092-5093                                          377 S. W. 2d 14

Opinion delivered March 23, 1964.

[Rehearing denied April 20, 1964.]

*Thomas L. Cashion* and *George Howard, Jr.,* for appellant.

*Bruce Bennett,* Attorney General, By *Jack L. Lessenberry,* Asst. Atty. General, for appellee.

CARLETON HARRIS, Chief Justice. On the night of February 16, 1963, a young woman resident of Monticello, a school teacher, 23 years of age, and her escort, Jerry Wilson, whom she had dated for some two years, parked in a lonely area in Drew County. The couple, on the evening in question, had previously met at a basketball game, following which they went to two restaurants, and, after leaving other friends, about midnight, drove to a country road, known as the old college road, and sometimes called "lovers' lane." According to the testimony of the young woman, they talked and listened to the radio for about an hour and a half, when they suddenly heard a voice on the man's side, telling them to get out of the car. Wilson got out, and she moved to the other side, and shut and locked the door. Another man on that side of the automobile demanded that the door be opened. As she asked Wilson what to do, the first man struck her companion over the head with the butt of a pistol, and she started the car and attempted to drive off; however, in the hurry, she was unable to locate the light switch, and the car went into a ditch at the side of the road; also, shots were being fired at her, and she felt a burning sensation at the back of her head. The two men, Negroes, knocked the glass out on the right side of the car, turned off the motor and radio, and dragged the prosecuting witness to their car, placed her in the back seat, and drove off. The smaller of the Negroes got in the back seat with her, and criminally assaulted her, the larger one driving the automobile at the time. The car was then stopped, and the larger Negro raped her. Thereafter, each one raped her a second time, on all occasions threatening her life if she did not cease resistance. Following the second attack by the larger Negro,

he again got into the driver's seat, the smaller one staying in the back with the victim, and after driving for a while, the car was stopped, and the larger man told her to take off all of her clothes.[1] Despite her pleadings, she was compelled to do so, and was then told to "start walking." After walking, completely naked, for some distance over a hard rock and gravel road, she finally came to a house occupied by a Negro couple, and screamed for help. The man and his wife permitted her to come in, and the husband told his wife to get some clothes to put on the victim, and they then took her to town. Within a few hours, appellants were arrested, and charged with the crime.

On February 25, counsel was appointed to represent the defendants, and thereafter, on motion of such counsel, appellants were committed to the State Hospital for observation. Subsequently, the Superintendent of the hospital submitted his report, finding that both appellants were "without psychosis;" further, that appellants were not mentally ill to the degree of legal irresponsibility at the time of the examination, and that they were "probably"[2] not mentally ill to the degree of legal irresponsibility at the time of the alleged commission of the offenses.

Thereafter, after the filing of several motions, which will be hereinafter discussed, the cases against appellants, by agreement of counsel for the state and the defendants, were consolidated for trial, and on April 9 the trial commenced, appellants pleading not guilty. The jury found both guilty of the crime of rape as charged, and the court thereafter entered its judgment, sentencing each to death.

After the trial, Harris obtained separate counsel, and a motion for new trial was filed. A similar motion

---

[1] At the time of the criminal assaults, the attackers had pulled down her undergarments.

[2] This word is used in conformity with the statute. The Superintendent of the hospital stated as to Harris, "however, he does have syphilis and treatment will need to be continued, for a total of twenty days. For the past seven days he has been receiving 600,000 units Procaine Penicillin G. intramuscularly daily and this should be continued for thirteen more days after Apr 1 2nd."

was filed on behalf of Trotter by the court-appointed attorney, who had represented the defendants during all proceedings. After a hearing, the court entered its order overruling both motions. Thereafter, the convictions were duly appealed to this court.

For reversal, appellant Harris relies upon four points, and appellant Trotter relies upon the same first three points. The alleged errors of the court are as follows:

"1. The Court abused its discretion in overruling appellant's motion for change of venue.

2. The Court erred in overruling appellant's motion to quash the jury panel and further erred in not granting a new trial after the submission of additional evidence on the contention that racial discrimination existed in the selection of jurors in Drew County.

3. The Court erred in permitting state witness to testify to alleged admissions made by appellant.

4. The Court abused its discretion in appointing one counsel to represent both appellants."[3]

Before discussing these points relied upon by appellants, and argued in their briefs, we first discuss the proof offered at the trial as a matter of determining whether there was substantial evidence to support the verdict. As is customary, the first three assignments of error in the motion for new trial assert that the verdict of the jury was contrary to the evidence, contrary to the law, and contrary to the law and the evidence. In addition to the testimony of the prosecuting witness, heretofore related, the following evidence appears in the record.

Jerry Wilson, a senior student at Arkansas A. & M. College, and the companion of the prosecuting witness on the occasion of the acts in question, testified that, after leaving other friends, he and the young woman drove out to the old college road and parked, talking and listening to the radio; that shortly after 1:00 A.M.

---

[3] Trotter does not include this point as grounds for reversal.

he heard a voice at the window, telling him to "Get out of that car," and he observed a Negro with a pistol standing at the window (later identified as Trotter). On opening the door to get out, the dome light of the car came on, and Wilson saw another Negro at the rear of the car that he subsequently identified as Harris; he gave Trotter his wallet and pocket change, and was ordered by that appellant to turn around. The witness testified that he was then hit in the back of the head, and knocked to the ground; that he heard a shot as the car suddenly drove away; that two other shots were fired, and he arose to his feet, and started toward the car which had gone into the ditch; that Harris grabbed him, but he managed to get free; that he broke away and ran to a house about a quarter of a mile back, and there telephoned the sheriff. Wilson had observed a 1953 or 1954 Plymouth with a light top and dark bottom parked a short distance back of where he had parked.

Sheriff Jack Towler of Drew County and other officers answered the call, but drove back into Monticello upon receiving information by radio that the young woman had been brought into town. Both the woman and Wilson were taken to the hospital; Wilson's head was dressed, and, after remaining at the hospital for about an hour, he left with the officers. They proceeded to the home of Trotter, and the witness noticed the car beside the house, and identified it as the one he had earlier seen on the road at the scene of the crime. After examining the automobile, Wilson went inside the house with the officers, and recognized Trotter as one of the attackers. Thereafter, around 8:00 o'clock in the morning, Wilson was taken to the jail to see Harris, who had in the meantime been arrested.

"We stood at the cell door. I saw this little Negro, which I know now as Harris, and he stood over by the bunk. I looked into the cell at him. I looked at this man and made the statement, 'do you remember me? Have you seen me before?' He looked right at me and remarked, 'yes I saw you last night.'"

When asked, during the trial, if he was positive in his identification of the two men that had attacked him, Wilson replied, ''Yes Sir. I am absolutely positive. I have no feelings of doubt.''

Dr. Paul Allen Wallick, a physician of Monticello, testified that he received a call to go to the hospital about 4:00 A.M.; that after arriving, he examined the young woman and Wilson. As to the woman, he stated:

''She was on the examining table. She was draped with a sheet. Underneath the sheet she had on a rather faded loose fitting dress without any underclothes. There was blood over her face and in her hair and down her neck and shoulders. And some on the dress. There was blood down her legs and around her genital area—female area and up on the abdomen. She had a perforating wound of the scalp, again in the area of the back of the head. One entrance was approximately an inch and a half from the exit. I'll put it this way. The two openings were about an inch and a half apart.''

He stated that the head wound was caused by an object which ''penetrated one side and exited on the other side.'' In describing his examination of her private parts, the doctor stated:

''There was a large amount of bright red blood in the pubic hair, down the thighs, down to and below the knees. There was bright red blood, which was still fresh, coming from the female opening. There was blood on the external portion of the female opening and also blood in the female canal—birth canal. She had a laceration or a tear of the hymeneal ring, which is commonly known as the virginal ring, which extended through the entire ring into the internal portion of the vaginal canal.''

He stated that she had been penetrated, and further, that he found large blisters on the ball and toes of each foot.

As to Wilson, the witness stated that he found a ragged lesion of the scalp in the parieto-occipital area (back of the head). The doctor stated that he washed the

head area, shaved the hair from around the wound, applied a dressing, and gave the patient a shot of penicillin and tetanus toxoid.

Sheriff Towler verified that he had received the call from Wilson, and went to the place where the attack had occurred. There, he found an automobile in the ditch with the left front glass and the right vent glass broken; after receiving the radio report that the young woman had been taken into town, he immediately went into Monticello where he was informed that Trotter owned a car fitting the description that Wilson had given to him; he then proceeded to Trotter's house, saw a 1953 or 1954 Plymouth two-toned automobile parked there, checked the car, and noticed stains of some sort on the rear seat, and observed that the hood was still warm. The officer testified that he was then admitted to the house by Trotter, and saw stains of some kind on the shorts which Trotter was wearing. Trotter was married, but was living with his Mother. The sheriff stated that he advised Trotter of his constitutional rights, and that the suspect did not have to tell him anything. The officer then questioned Trotter as to his whereabouts during the night, and was told that the appellant had gone to Dermott, naming persons who had purportedly been with him. The officer next asked Trotter if he could explain the blood on his shorts, but no explanation was forthcoming. Towler noticed a speckled shirt, lying on the foot of the bed, which Trotter stated was the shirt that he had been wearing. The shirt had blood on the right sleeve, and on the tail. Appellant identified the clothes that he had been wearing, and the sheriff rolled them up and placed Trotter under arrest. He was taken to the jail, Trotter driving his own car. The sheriff next checked with the persons that Trotter had mentioned as making the trip to Dermott with him, and from one of them, obtained information that caused him to go to the home of Albert Harris. Harris' wife admitted the officers, and Harris was in bed. After being questioned relative to his whereabouts during the night, and what he had worn, Harris produced a pair of corduroy pants, and the sheriff dis-

covered a ladies' wrist watch in Harris' billfold which
was found in the pocket of the trousers. Towler stated
that he told appellant that, under the Constitution, he
(Harris) did not have to say anything, but with that
understanding, he would like to know about the watch.
Harris then said that he obtained the watch from Orion
Trotter, and further stated that, after returning from
Dermott, he and Trotter drove out on the road in the
country, stopped their car and walked down to the auto-
mobile, which was parked; that they got the boy out,
and took the young woman and put her in Trotter's car.
Harris stated that he was driving, and did not participate
in any way in the rape.

After daylight, the car from which the woman had
been dragged was examined, revealing shattered glass on
the floor board and in the seat, and blood on the front
cushion. An examination was made of Trotter's auto-
mobile, and blood stains were found in the rear seat of
the car, and also blood on the left rear door panel. The
back seat was taken out, and a red billfold discovered.
The billfold contained a poll tax receipt with the name
of the prosecuting witness on it, a deposit slip from one
of the Monticello banks, and several receipts from
stores.[4] Subsequently, the sheriff called the circuit judge,
and obtained a court order to transfer the prisoners to
the state penitentiary. Towler returned to the home of
Trotter, and advised appellant's Mother that he was
looking for a gun that was involved in the alleged crime.
When told that he would have to get a search warrant,
the officer started to leave for that purpose, but was then
informed that there was a gun in the house, and that it
belonged to her. She pulled up a mattress, and took out
a brown paper sack which had a 38 caliber pistol in it.
Towler noticed a hair hanging from the ejector, and with
the permission of appellant's Mother, took the pistol
with him. On closer inspection, he noticed that a part
of the handle on the butt had been broken. On going
back to the scene, and making the search with one of the

---

[4] At the trial, the prosecuting witness identified the ladies' wrist
watch and red billfold as her property.

city officers, a piece of handle was found on the ground where the right vent of the car had been shattered. The gun, piece of handle, and various items of a woman's clothing which were subsequently found by the officers in the general area of the crime, together with two bullets which were recovered from the car operated by the woman, were taken to the crime laboratory in Little Rock for examination.

Captain Paul McDonald of the State Police, in charge of the crime laboratory, testified that the broken piece of pistol handle fit the handle of the pistol which had been sent in, and also, in explaining to the jury the ballistics test that was made, positively identified one of the bullets found in the car as being fired from the pistol.[5]

Dr. Robert R. Cole, resident physician at the University of Arkansas Medical Center, testified that he performed a benzidine test, and determined that the stains on the various articles of clothing were human blood. He was unable to type the blood stains, nor could he determine if the hair on the gun was the same as the sample received.

Artis Lee Jefferson testified that around 3:00 o'clock in the morning, he heard his dog barking.

"He was barking like he hadn't been barking before and I told my wife I was going to get up and look and see what was happening. About the time I got to the door somebody was bamming on the door. I never had heard anything like that before. There·was a bunch of screaming and hollowing and crying for help and I didn't go to the door. So, finally the door opened and there was a lady with no clothes on. * * * I backed back in the room after I seen what kind of shape she was in. I told my wife to come."

Clemie Jefferson, the wife, verified the statements of her husband, stated that she gave the girl some clothes

---

[5] The captain stated that he was unable to make identification of the other bullet due to its battered condition.

to put on, and noted the bleeding on the head and private parts.

This summarizes the evidence offered at the trial, and it is quite apparent that it was ample to sustain the finding of the jury. We now proceed to a discussion of the points specifically relied upon by appellants for reversal.

## I.

*The Question of Change of Venue.* Ark. Stat. Ann. § 43-1502 (1947) sets forth the manner in which a defendants shall apply for a change of venue. That section requires the affidavit of two credible persons, who are qualified electors, residents of the county, and not related to the defendant in any way, wherein the facts relied upon for change of venue are set forth. In *Hildreth* v. *State,* 214 Ark. 710, 217 S. W. 2d 622, though no affidavits were presented, we held that the trial court erred in refusing to hear testimony in support of a motion for a change of venue. There, it was said:

"The court's action in refusing to hear testimony was contrary to established principles. We have held that the trial court must be guided by the evidence and cannot rely upon its own knowledge of local conditions, for the judge must not also be a witness."

In the instant case, the court did hear testimony, which was offered by counsel for appellants, including that of the Chief of Police of Monticello, the Sheriff of Drew County, and Mrs. Frances Jaggers, the editor of the Monticello newspaper. The evidence reflected that there had been a lot of discussion about the case, and the Chief of Police stated that it had received quite a bit of publicity; however, the witness said that he had not heard any threats made, nor any expression as to the guilt or innocence of the men who had been charged. The sheriff testified that appellants were taken into custody before common knowledge of the crime spread over the city and county; that there was no gathering of crowds; that he had received no information that caused concern

as to their welfare. Mrs. Jaggers testified that an article appeared in her paper on February 21, dealing with the arrest, and a subsequent article relative to the appointment of counsel and the transfer of the prisoners to the State Hospital. She stated that no unusual number of people had talked to her about the case, and that she had heard no rumors or statements of violent feelings toward the defendants.

Counsel for Harris asserts that appointed counsel did not have sufficient opportunity to make an investigation as to public sentiment. We do not agree, since the record reflects that counsel was advised of his appointment to represent appellants on February 25, and the hearing on the request for change of venue was heard on April 5. It is also pointed out that the circuit judge entered an order on the same day that appellants were arrested, directing that the prisoners be transported to the State Penitentiary for safekeeping. We do not think this precautionary action by the circuit judge indicates that appellants could not obtain a fair trial in the county. In fact, it would appear that the order was issued before news of the crime became widespread. Certainly, it was prudent that such action be taken where such a violent crime had been committed. But the fact that the court was "playing safe," as far as the welfare of the prisoners was concerned, does not establish a feeling of hostility and vindictiveness among the residents of the community. An individual may lock the doors of his home at night, but this does not mean that he expects someone to unlawfully enter his house; rather, it is only a precautionary move to prevent the possibility of that happening. In the cases of *Perry and Coggins* v. *State of Arkansas,* 232 Ark. 959, 342 S. W. 2d 95, and *Lauderdale* v. *State,* 233 Ark. 96, 343 S. W. 2d 422, the defendants were charged with participation in the dynamiting of the Little Rock School Board Office, and other property, the violence being designed to harass the Little Rock School Board and certain city officials for their role in the integration of Negro pupils into the Little Rock school system. In the *Perry and Coggins* case, a

change of venue was sought, which included thirteen supporting affidavits, nine of the thirteen testifying at the hearing to the effect that the defendants could not receive a fair trial. The state filed counter affidavits from twenty-seven persons, twenty-one testifying to the contrary. In the *Lauderdale* case, both appellant and the state called witnesses in regard to the change of venue, twenty-three persons testifying. In each instance, the court declined to grant the motion, and we held that it had not been shown that the court abused its discretion in refusing to enter such an order.

Here, there is not one line of evidence in the record which indicates that appellants could not receive a fair trial in Drew County, and we certainly cannot say that the court abused its discretion in refusing to grant the motion.

## II.

*The Question of Racial Discrimination in the selection of Jurors in Drew County.* Appellants vigorously argue that members of the Negro race have been systematically excluded, or their number limited, in the selection of the jury panel. A motion to quash the panel because of systematic exclusion of members of the Negro race was filed by the court-appointed counsel on April 2, and counsel examined the sheriff, Cecil T. Boone, one of the jury commissioners, and Audrey Withers, the circuit clerk, relative to this contention. This evidence reflected that approximately 4,000 poll tax receipts were issued in the county in 1962, of which approximately one-fourth was issued to Negroes. Examination disclosed that a poll tax book was furnished the jury commission, the book designating the race of the qualified electors. The clerk then testified as to the number of Negroes who had served on the jury at the various terms of court since 1957. The court denied the motion. Following the filing of the motion for a new trial. additional testimony was submitted on this same point. This evidence included the fact that the percentage of non-whites in Drew County was 33.9% of the total population.

Witnesses examined were the county clerk, Boone the circuit clerk, Ed Grubbs, a jury commissioner, Arnett Spencer, a Negro citizen of Drew County, Arthur Brown, a Negro citizen of Drew County, Joseph Sims, likewise a Negro citizen of Drew County, and the sheriff. By this evidence, appellants sought to show that only a small percentage of eligible Negroes had served since 1953; that the jury commissioners had made no special effort to acquaint themselves with qualified Negro electors; that several Negroes called for jury service had been called several times before, and that many of the Negroes were over the age of 65 years.

At the outset, let it be stated that we are definitely of the opinion that, under our rules of procedure, appellants are not in a position to complain that they were not tried by an impartial jury, *i.e.,* they did not exhaust their peremptory challenges. The record herein reveals that eight Negroes appeared on the jury lists; that two of these Negroes were excused by the court for cause, and three were excused by appellants' counsel through peremptory challenge after the state's attorney had accepted them; actually, three Negroes remained on the panel whose names were not called, because the jury had already been accepted[6] before their names were reached.

Under Arkansas law (Ark. Stat. Ann. § 43-1922 (1947)), a defendant in a capital case is given twelve peremptory challenges, and, in the instant case, appellants only used eight peremptory challenges. Throughout the years, no rule of procedure has been more consistently adhered to than the rule that a defendant cannot complain of the composition of the jury if he does not exhaust his challenges. In *Benton* v. *State,* 30 Ark. 32, decided in 1875, Chief Justice English pointed out that this rule had stood as a precept of criminal practice in this state, for a period of over 22 years. In a long line of cases, we have consistently upheld the rule to the present time. A cursory examination of our cases reveals

[6] The record does not reveal the position of any of the names on the panel.

over thirty-five criminal cases in which this rule has been cited and adhered to. *Wright* v. *State,* 35 Ark. 639; *McDaniel* v. *State,* 228 Ark. 1122, 313 S. W. 2d 77; *Glenn* v. *State,* 71 Ark. 86, 71 S. W. 254; *Keese & Pilgreen* v. *State,* 223 Ark. 261, 265 S. W. 2d 542; *Johnson* v. *State,* 97 Ark. 131, 133 S. W. 596;[7] *Morgan* v. *State,* 169 Ark. 579, 275 S. W. 918;[8] *Rutledge* v. *State,* 222 Ark. 504, 262 S. W. 2d 650; and *Kurck* v. *State,* 235 Ark. 688, 362 S. W. 2d 713.

The Federal rule appears to be the same. In *Jordan* v. *United States of America,* 295 F. 2d 355 (1961), Jordan was found guilty by a jury of the purchase and sale of narcotics. In seeking to reverse the judgment, he set up two grounds, one of which was the fact that the trial court erred in denying his motion to quash the jury panel. Jordan had been tried twice on these charges during the same jury term. In the first trial, the jury disagreed, and a mistrial was declared. Prior to his second trial, and during the same term, thirteen other defendants in narcotic cases had been tried and convicted. Government witnesses against Jordan had testified in some of the other trials. Jordan's motion to quash the jury panel alleged the mistrial, the number of other cases involving narcotic violations and heard by some members of the same jury panel, and the publicity given such trials, as reasons for the impossibility of a fair trial for him before the jury panel. At the second trial various

---

[7] In this case the court said: "In *York* v. *State,* 91 Ark. 582, a felony case, where the trial court had, without sufficient legal grounds, excused five jurors from the regular panel, and caused bystanders to be summoned to take their places, the defendant accepted the jury without exhausting his challenges, and this court ruled that the error of the trial court was not prejudicial. Quoting from a previous decision, this court held that an accused has the right to the service of no particular juror, and that 'when he has voluntarily taken his chance of acquittal at the hands of jurors whom he might have rejected, he must abide the issue.' *Mabry* v. *State,* 50 Ark. 492. We perceive no sound reason why the same rule should not prevail in capital cases."

[8] Here the defendant moved that the panel be discharged because all of the members resided in or near Pine Bluff, where the trial occurred, and appellant insisted that he could not obtain a fair trial in that city. The motion was denied, and Morgan asserted in this court that the overruling of the motion constituted error. Among other reasons for finding appellant's argument to be of no avail, this court pointed out that he did not exhaust the peremptory challenges allowed him by law in impanelling the jury.

questions were asked at the *voir dire* examination of the jurors. There were no challenges for cause and Jordan exercised only five of his ten peremptory challenges. The selected jury consisted of four new members of the panel, two from the old panel, who had sat on none of the previous narcotic cases, and six of the old panel, who had been on such cases. In holding the alleged error to be without merit, the United States Court of Appeals, Tenth Circuit, in an opinion by Judge Breitenstein, said:

"By his failure to exercise any challenge for cause, and by his use of only half of his peremptory challenges, the defendant has waived the right to complain that he was not tried by an impartial jury."

On January 22, 1962, the United States Supreme Court denied Certiorari. See also *Graham* v. *United States*, 257 F. 2 724.

In *People* v. *Ford*, 168 N. E. 2d 33 (Illinois), Ford was found guilty of murder, and sentenced to the penitentiary for a term of 99 years. Several alleged grounds for reversal were raised, which were found to be without merit by the Illinois Supreme Court. From the opinion:

"Further objecting to the jury, defendant argues that he was prejudiced by the fact that the first eight jurors accepted were Negroes, by improper remarks made by the State's Attorney during the *voir dire,* and by the length of the *voir dire* itself. It is true that the first eight jurors picked in this case were Negroes, and that after two of those jurors had expressed reluctance about serving upon an all colored jury and the defense counsel had asked that Negroes be excluded from the third jury panel, the court sustained the defendant's motion and thereafter only white jurors were accepted. We fail, however, to see how defendant was prejudiced by this action. Since the record does not indicate that he exhausted his peremptory challenges, he was as much responsible for picking the first eight jurors as was the People, the remaining jurors were selected in accordance with his own request. We have frequently stated that a defendant, having failed to use his peremptory chal-

lenges, is in no position to complain concerning jury selections."

These holdings seem to be in accordance with the general rule. In 50 C.J.S., Paragraph 256, Pages 1017 and 1018, we find:

"*Failure to exhaust peremptory challenges.* It is ordinarily held that, if a competent jury is obtained without exhausting the peremptory challenges of the objecting party, he cannot avail himself of any error or irregularity in the summoning or selection of the jury, or in the action of the court in *refusing to sustain a challenge to the array, or motion to quash the venire;*[9] or in excusing or not excusing jurors, or rejecting and discharging jurors if its own motion for insufficient cause."

However, in *Darcy* v. *Handy,* 351 U. S. 454 (1955), when counsel did not exhaust his peremptory challenges, the United States Supreme Court stated:

"The failure of petitioner's counsel to exhaust the means provided to prevent the drawing of an unfair trial jury from a community allegedly infected with hysteria and prejudice against petitioner while not dispositive, is significant."

While under our holdings, throughout the history of this court, the alleged point is without merit, nevertheless, because of the fact that numerous cases from various jurisdictions have been reversed due to alleged discrimination in the selection of the jury panel, and because of the holding in *Darcy* that the failure to exhaust peremptory challenges is, though significant, not conclusive, we discuss the various facts relied upon by appellants to establish discrimination.

First, appellants point out that Negroes comprise 33.9% of the population, and 25% of the qualified electors of Drew County, but that for the past twenty-one consecutive terms of court, only 6.3% of the persons

[9]Our emphasis.

called for jury service have been Negroes. In *Cassell* v. *Texas*, 339 U. S. 282, it was held that a jury is not required to have proportional representation of races in order to assure equal protection of the law. In fact, that case held that proportional racial limitation, as such, is forbidden. It is true that up until the February 1963 term of court, the number of Negroes selected for jury service had not exceeded five, and in most instances did not exceed three; however, at the term of court in question, eight Negroes were called for service. If proper representation was included in this panel, there certainly could be no prejudice to appellants because of discrimination in prior years. Under that argument, a proper panel could never be selected. Appellants vigorously argue that none of the commissioners testified that they made an effort to become acquainted with the Negro electors in Drew County. This is an effort to bring the case within an additional holding in *Cassell* v. *Texas, supra.* There, jury commissioners in Dallas stated that the reason they did not select Negroes for the grand jury list was because of the fact that they did not know any who were qualified. It was shown that in selecting persons for grand jury service, the commissioners had consistently limited the selection of Negroes to not more than one on each grand jury. The United States Supreme Court reversed because of discrimination.

Two of the commissioners testified in the instant case, and their testimony was to the effect that they selected Negroes that they knew to be qualified, but made no particular effort to learn of others who might be qualified. The third commissioner was not called by appellants to testify. Of course, because of population, the selection of eight jurors in Drew County, Arkansas, with a total population of slightly over 15,000, is hardly comparable to the selection of one juror in Dallas County, Texas, with a population of approximately 400,000, and we can find nothing in the *Cassell* case that indicates discrimination in the present case. In connection with this argument, appellants complain that the poll tax lists were used, which show the race of the elector. In

*Avery* v. *Georgia,* 345 U. S. 559, the Supreme Court said,

"Obviously that practice makes it easier for those to discriminate who are of a mind to discriminate."

In *Smith* v. *Texas,* 311 U. S. 128, the same court stated that "discrimination can arise from commissioners who know no Negroes as well as from commissioners who know, but eliminate them." This presents somewhat of an enigma, for it is puzzling to determine how a jury commissioner, who is acquainted with but few, if any, Negroes, can go about finding qualified members of that race without the use of a list designating the race of those eligible to serve.[10] In other words, in making an effort to obtain qualified Negroes for the panel, his inquiry and investigation as to their qualifications to serve would seem to depend upon his first ascertaining that they were Negroes. Appellants assert that,

"While the jury commission has gone about to systematically include a few Negroes on the panel, they have done so in a manner as to further discriminate against the Negro by restricting the number to a few that it would be virtually impossible to actually get a Negro on a particular jury without the approval of the. prosecutor, even though there may be Negroes on the panel inasmuch as the state has ten peremptory challenges in a capital case."

It is interesting to note that it is conceded that Negroes have been *systematically included,* but, according to this contention, there would have to be as many as eleven colored jurors on any regular panel in Arkansas, else there is discrimination. This contention was passed on adversely to appellants' reasoning in *Hall* v. *United States,* 168 F. 2d 161.

Complaint is made that some Negroes called for jury service had been called several times before. While

[10] Only electors are eligible to serve on a petit jury. Ark. Stat. Ann. § 39-208 (Repl. 1962). To qualify as an elector, one must, *inter alia,* pay a poll tax. Amend. 8, Art. 3, § 1, Ark. Const. of 1874. This case was tried before ratification of the 24th Amendment to the Federal Constitution.

the record is far from clear, we are unable to determine that more than two members of this panel had been called before, one on several different occasions. This would hardly seem sufficient repetition to indicate studied discrimination.

Finally, appellants mention that several who have served as jurors were 65 years of age or over. We know of no case which holds that elderly people, merely because of their age, are disqualified from jury service.[11] Under Arkansas law, Ark. Stat. Ann. § 39-104, (Repl. 1962), persons 65 years of age cannot be compelled to serve on a grand or petit jury, and the court is authorized to excuse those who may be selected for jury service who are over 60 years of age, but there is certainly no evidence in this record that any juror was compelled to serve. It is entirely logical that the commissioners would be more acquainted with the qualifications of elderly or middle aged Negroes, since these men would have had more opportunity to establish themselves in the community. In *Bailey* v. *Henslee*, 287 F. 2d 936, nine facts were mentioned which the court said, in the aggregate, led to the conclusion that a *prima facie* case of limitation of members of the Negro race in the petit jury panel had been established, and that the state did not rebut it. Even then, the court commented that "this case may be a close one." In the present case, it would not appear that over four of those factors are present to any degree, and we are not persuaded that discrimination is shown.

*Question of State Testimony as to Admissions.* This alleged error has reference to the testimony of the sheriff, wherein he stated that Harris admitted that appellants had placed the prosecuting witness in their car, and that he had driven same; also, the testimony of the sheriff that Harris stated that he obtained the watch from Trotter. The court instructed the jury at the time

---

[11] The situation here is vastly different from that in *Reece* v. *State of Georgia*, 76 S. Ct. 167, where only six names of Negroes appeared out of five hundred and thirty-four names on the grand jury list, and one lived outside the county, two were over 80 years of age, one was partially deaf, and one was in poor health. In the instant case, one juror, 66 years of age, was excused because of illness.

that this testimony could not be considered in determining Trotter's guilt or innocence. It is urged that these admissions were introduced into evidence before the jury, without first having been considered by the court in the absence of the jury, and prejudicial error was thus committed. It is true that, normally, testimony relative to the voluntariness of a confession is first taken in chambers, and if the court finds that the confession was not voluntarily made, the state is not permitted to introduce it. On the other hand, if there is a question as to the voluntariness, the matter is presented to the jury for their determination. This procedure is generally followed where written confessions are under examination, and where there is a contention that the confession was involuntarily made. The failure to first hear testimony in chambers does not, in itself, mean that reversible error has been committed. In *Davis* v. *State,* 182 Ark. 123, 30 S. W. 2d 830, we said:

"The practice in such cases has been defined in numerous decisions of this court. It is to this effect. When testimony in the nature of a confession is offered, the accused has the right to object to its admission, upon the ground that the alleged confession was not voluntarily made, in which event the trial court should hear testimony as to the circumstances under which the alleged confession was made, and should exclude the confession if it was not voluntarily made. If the testimony is conflicting on that question, the jury should be told to disregard the alleged confession unless they found that it was, in fact, voluntarily made, but, if it appeared to have been voluntarily made, to consider it in connection with all the other evidence in the case.

"No such request was made, nor were any instructions asked upon that question. Statements in the nature of a confession are not to be excluded for the reason only that they were made to an officer having the accused in custody, and, if Long voluntarily made these statements to, or in the presence of, the witness Hendricks, there is no reason why he should not have been allowed to testify concerning them."

Let it be remembered that there is no assertion that any statements were obtained by duress, threats, or promises. While it is true that the burden is on the state to establish the voluntariness of a confession or incriminating admissions,[12] the record reflects that the sheriff told Harris (as well as Trotter) that he did not have to make any statements, and informed him of his constitutional rights. This fact stands undisputed.

It is alleged that Harris was denied his constitutional rights in that he was aroused from bed between 3:00 and 4:00 o'clock in the morning, questioned while partly undressed, arrested without a warrant, and not taken immediately before a magistrate. It is uncontradicted that Harris' wife permitted the officers to enter the apartment, and no objection was offered to their presence during the investigation. Under our statutes, Harris' wife could not be called by the state to corroborate the invited entrance, but she could have been called by Harris to refute the proposition. Certainly, there was no occasion for the officers to wait until the daylight hours of the morning before questioning and arresting Harris, inasmuch as they had sufficient information to form a reasonable belief that he might well be a participant in the crime that had been committed. Ark. Stat. Ann. § 43-403 (1947) provides that a peace officer may make an arrest without a warrant where he has reasonable grounds for believing that the person arrested has committed a felony. The fact that one arrested is not taken immediately before a magistrate does not, of itself, invalidate a confession. *State* v. *Browning,* 206 Ark. 791, 178 S. W. 2d 77. Actually, it does not appear that the matters herein mentioned were objected to by appellant at the time.[13] Counsel did object on the basis that the testimony was inadmissible as to Trotter, and, as mentioned, the court so instructed the jury. Counsel subsequently, objected when it was indicated that the prosecuting attorney would interrogate the sheriff about

---

[12] The court properly and fully instructed the jury in this regard.

[13] In capital cases, exceptions to an adverse ruling need not be noted, but it is still necessary that an objection be made. *Fields* v. *State,* 235 Ark. 986, 363 S. W. 2d 905.

statements made by the prisoners as they were being returned from the penitentiary for trial. However, this objection did not go to the question of whether the statements were made voluntarily,[14] and, moreover, the state proceeded no further with the interrogation. We find no merit in this contention.

*The Question as to the Appointment of One Attorney to Represent Both Appellants.* Finally, it is urged that the court committed error in appointing only one attorney to represent both appellants. At the outset, it should be pointed out that no suggestion of prejudice to the rights of either appellant, because of this fact, was mentioned before or during the trial. This argument appears for the first time in Harris' motion for new trial. In general, where the interests of defendants are conflicting, or the duties of counsel are found to be conflicting in representing more than one defendant, it has been held that there is a deprivement of the constitutional right to the effective assistance of legal counsel. There are numerous cases on this subject, but all are finally determined on the basis of the rule stated. For instance, in *Glasser* v. *United States,* 315 U. S. 60, Glasser had retained counsel named Stewart. An attorney named McDonnel was appointed for Glasser's co-defendant, a man named Kretske. Subsequently, McDonnel informed the court that Kretske did not wish to be represented by him. The court suggested that perhaps Stewart could act as Kretske's attorney. The defendant, Glasser, objected, stating, ''I would like to have my own lawyer representing me.'' A colloquy then insued between the court, McDonnel and Kretske, and Kretske advised that he had just spoken to Stewart, and that Stewart had said that he would accept the appointment. Glasser remained silent. It developed that a conflict of interest did appear, and Glasser, on appeal, pointed out that certain

---

[14] "The defendants specifically object to the testimony of the Sheriff regarding any statements made to him by the defendants, Trotter and Harris, for the reason that they had not been carried before a magistrate or charged with any crime, that making said statements while in custody without the benefit of counsel was in violation of their rights under Fifth Amendment and they had no way of knowing that said statements could be used to incriminate them."

testimony, inadmissible as to him, was allowed without objection by Stewart on his behalf, because of Stewart's desire to avoid prejudice to Kretske. The judgment was reversed. On the other hand, in *Farris* v. *Hunter*, 144 F. 2d 63, appellant charged that he was represented by counsel, appointed by the court, who also represented his co-defendant, and he stated that he had protested, contending there was a divergence of interest between the co-defendants, which rendered the same attorney incompetent to represent the two of them. The Circuit Court of Appeals for the Tenth Circuit, after obtaining a transcript of the testimony bearing upon this point, stated:

"In the light of the seriousness of this charge, we held the case in abeyance until a transcript of the testimony bearing upon this point in the court below could be transcribed and certified here for our consideration. From the record now before us, it is clear that the appellant did not contend in the trial court that he protested the appointment of Roberts' attorney to also represent him, and that he did not point out or call attention to any conflict or divergence of interest between the co-defendants. Furthermore, there is nothing in the record from which it can be inferred that the representation of the co-defendants by the same counsel resulted in any embarassment to the attorney or prejudice to his clients."

In *Peek* v. *United States*, 321 F. 2d 934, Peek contended that a conflict of interest existed between appellant and Susanna Peek, which prevented their joint trial counsel from giving to either his undivided loyalty. Peek was charged with robbery and conversion, and Susanna Peek, with conversion. In deciding adversely to this contention, the court held that the interests of appellant and Susanna were not in conflict with each other, and Peek had not been denied his right to counsel. In *Lott* v. *United States*, 218 F. 2d 675, the same argument was advanced. The court said,

"Upon submission, counsel for appellants raised as alleged fundamental error the fact that the court ap-

pointed the same counsel to represent defendants Reed, Pearce and Shaw, citing *Glasser* v. *United States,* 315 U. S. 60, 68-76, 62 S. Ct. 457, 86 L. Ed. 680. That case held that Glasser was deprived of his right, under the Sixth Amendment, to the assistance of counsel where the court, over objection, required his counsel to represent a co-defendant, with notice that their interests might be in conflict. Here there was neither objection, claim, nor notice to the court of any alleged conflict between the interests of the three defendants. We hold, therefore, that there was no denial of their constitutional right to the effective assistance of counsel.''

In *Case* v. *State of North Carolina,* 315 F. 2 743, Case and a co-defendant, Shedd, were indicted and tried jointly for the offense of rape. Both were found guilty, the jury recommending life imprisonment for Shedd, but making no such recommendation with regard to Case. This meant, for the latter, that a death penalty was mandatory. The same attorney represented both men, though Shedd's family obtained additional counsel. When the trial commenced, counsel for Case moved for severance, stating that he represented both defendants, and that he was fairly certain that a conflict would arise between their interests. This motion was overruled. On appeal, the court (U.S.C.A. Fourth Circuit) reversed, finding that this conflict of interest was present at every stage of the trial. It is pointed out in the opinion that counsel sat silent while Shedd's confession was read, such confession not only implicating Case, but indicating that Case was the leader in the crime. In *U. S.* v. *Bentvena,* 319 F. 2d 916, three appellants, all represented by the same attorney, raised this same point. The argument was rejected, the court commenting that an appellant ''must show some conflict of interest between himself and the other defendants represented by his attorney before he can claim successfully that the joint representation deprived him of his right to counsel.'' A long list of cases to the same effect is then cited. Actually, it appears that each case must be determined on its own particular facts.

In the case before us, as previously stated, there was no suggestion to the court that adequate representation could not be afforded by the single attorney appointed to represent the defendants. After the state rested, counsel took the appellants into chambers as a matter of making a record that the decision to testify, or not to testify, was being determined by the appellants themselves.[15] Counsel discussed with defendants this question, and recommended, for reasons appearing in the record, that they not testify, but the decision was left to Trotter and Harris. During this discussion, both appellants expressed their approval of counsel, and his efforts, during the trial.

We find no conflict of interest. Both men were charged with the same offense, which grew out of the same occurrence. The only evidence, which in any manner could be said to indicate a conflict of interest, was the statement of Harris made to the sheriff that, though he drove the car, he did not actually rape the prosecuting witness. This might indicate that he was only an accessory, but the distinction between principals and accessories was abolished in this state in 1936. See Ark. Stat. Ann. § 41-118 (1947). Accordingly, even under this statement, if Harris were guilty, he was guilty as a principal. When this testimony was offered, counsel immediately asked the court to instruct the jury that this evidence could not be considered in the case against Trotter. This action by counsel was vastly different from *Case* and *Glasser,* where counsel sat silent while evidence from one co-defendant strongly implicated the other defendant. It will also be observed that in *Case,* Shedd (whose confession had placed the chief blame on Case) received a lesser sentence than Case, indicating that this evidence had operated to his advantage, and to the disadvantage of his co-defendant. Here, both men received the same sentence.

For that matter, Harris does not argue that there was a conflict of interest; rather, it is only asserted

---

[15] This procedure was commended in *Nail* v. *State,* 231 Ark. 70, 328 S. W. 2d 836.

that appointed counsel did not have time to investigate the background of both defendants. Counsel for Harris states that his client had been discharged from the United States Navy because of epilepsy, and, at the hearing on the motion for new trial, offered an exhibit relative to Harris' medical history while in the Navy. It is also alleged that Harris was at the Fort Roots Hospital for about a day. These allegations, and evidence offered, are an apparent attempt to show insanity. It must be remembered that both appellants were sent to the State Hospital for psychiatric examination, and the hospital submitted a report, heretofore referred to, but at any rate, the issue of insanity should have been raised, and the plea interposed, before, or during, the trial, in accordance with the statute. See Ark. Stat. Ann. § 43-1301 (Supp. 1963).

Various other assignments of error are mentioned in the motion for new trial, relating to instructions, a motion on behalf of appellants for closed trial, and other miscellaneous objections. Because of the length of this opinion, we will not specifically discuss these alleged errors, but all have been examined, and we find no prejudicial error.

Affirmed.