361 F.2d 888
 Albert HARRIS, Appellant,
v.
Dan D. STEPHENS, Superintendent of Arkansas State Penitentiary, Appellee.
Orion TROTTER, Appellant,
v.
Dan D. STEPHENS, Superintendent of Arkansas State Penitentiary, Appellee.
 No. 18062.
 No. 18063.
 United States Court of Appeals Eighth Circuit.
 June 16, 1966.
 
 George Howard, Jr., Pine Bluff, Ark., for appellants. Thomas Cashion, Eudora, Ark., was with him on the briefs.
 Jack L. Lessenberry, Little Rock, Ark., for appellee. Bruce Bennett, Atty. Gen., Little Rock, Ark., was with him on the brief.
 Before VAN OOSTERHOUT and MEHAFFY, Circuit Judges, and VAN PELT, District Judge.
 MEHAFFY, Circuit Judge.
 
 
 1
 Orion Trotter and Albert Harris were convicted in the Circuit Court of Drew County, Arkansas for the crime of rape and sentenced to death. The convictions were affirmed by the Arkansas Supreme Court. Trotter v. State, 237 Ark. 820, 377 S.W.2d 14 (1964), and certiorari denied by the United States Supreme Court, Harris v. Arkansas, 379 U.S. 890, 85 S. Ct. 163, 13 L.Ed.2d 94 (1964). Habeas corpus proceedings brought in the United States District Court for the Eastern District of Arkansas were also denied. Following the teachings of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the District Court did find that Harris was entitled to an evidentiary hearing by the state court to determine the voluntariness of certain admissions, or, in the alternative, to a new trial. Trotter v. Stephens, 241 F.Supp. 33 (1965). The legal questions presented are neither complex nor without respected precedents. The real significance of this appeal is that it involves death sentences for interracial rape. Chief Justice Harris of the Arkansas Supreme Court and District Judge Young wrote exhaustive opinions treating the salient issues and elaborately detailing the facts. Suffice it to say that the victim was a twenty-three year old virgin who was shot, raped four times by a Negro syphilitic and his confederate, and left naked on a sparsely inhabited country road in near freezing weather. During the assaults, her life was repeatedly threatened. These crimes have been characterized as perhaps the most brutal and vicious in recent Arkansas history.
 
 
 2
 This is another in the series of Arkansas death cases receiving close scrutiny by this court. Following guidelines laid down by the United States Supreme Court, this court has jealously guarded the rights of criminal defendants, no matter how evident their guilt nor how heinous or depraved their criminal acts.[1]
 
 
 The Legal Issues
 
 
 3
 Petitioners assign as error their trial in a hostile atmosphere; the existence of racial discrimination in the selection of the jury panel from which the jury was selected that tried and convicted petitioners; illegality of their arrests; use at trial of evidence resulting from an unlawful search and seizure; that petitioners should have been accorded separate counsel; that the death penalty upon convictions of rape has been applied with an uneven hand against Negroes; and that the imposition of the death penalty on conviction of rape where life was not taken denies due process of law.
 
 
 4
 We will treat each of the assignments of error in seriatim.
 
 
 Change of Venue
 
 
 5
 Petitioners first argue that denial of their motion for change of venue deprived them of due process of law as hostile community sentiment was such that they could not and did not receive a fair and impartial trial guaranteed by the Sixth and Fourteenth Amendments.
 
 
 6
 The basis of this position is predicated upon the court order transferring petitioners to the Arkansas State Penitentiary;[2] the newspaper account of the arrest;[3] defense counsel's lack of time to investigate community sentiment; and the clearing of the courtroom during the victim's testimony.[4]
 
 
 7
 The transfer order was obtained shortly after the arrests and before news of the crime could have been widespread. The transfer had nothing to do with the community sentiment. Three recent escapes from the Drew County jail necessitated the transfer for security purposes.
 
 
 8
 The newspaper account of the arrest merely noted that petitioners were arrested after a five hour manhunt and transferred to the State Penitentiary for security reasons. The only other local news account noted the appointment of counsel and transfer of the prisoners to the State Hospital for observation. Petitioners' cited cases of Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923), and Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), are clearly distinguishable from the instant case. We have neither the screaming mob as in Moore nor a televised confession seen by the county populace as in Rideau.
 
 
 9
 There is likewise no evidence that petitioners' counsel had insufficient time to make an investigation to support the motion for change of venue. Several days intervened from his appointment to the hearing on his motion, and it was not lack of time but the actual absence of supporting facts that would justify venue change that created counsel's stumbling block.
 
 
 10
 The argument concerning the closing of the courtroom to spectators during the testimony of the victim is equally spurious. This is a frequent and accepted practice when the lurid details of such a crime must be related by a young lady. See United States v. Geise, 262 F.2d 151 (9th Cir. 1958), cert. denied, 361 U.S. 842, 80 S.Ct. 94, 4 L.Ed.2d 80 (1959); Hogan v. State, 191 Ark. 437, 86 S.W.2d 931 (1935).
 
 
 11
 After having reviewed the record evidence,[5] we agree with Chief Justice Harris of the Arkansas Supreme Court, who stated:
 
 
 12
 "Here, there is not one line of evidence in the record which indicates that appellant could not receive a fair trial in Drew County, and we certainly cannot say that the court abused its discretion in refusing to grant the motion." Trotter v. State, supra, 237 Ark. at 831, 377 S.W.2d at 21.
 
 
 Jury Selection
 
 
 13
 Petitioners' contention that Negroes have been systematically excluded from jury lists has been rejected repeatedly.[6]
 
 
 14
 Of the seventy petit jurors, eight were Negroes. Of the five Negroes examined on voir dire at trial, two were excused by the court for cause and the three accepted by the prosecution were excused by petitioners' counsel. The defense exercised only eight of their peremptory challenges. Thus, an acceptable jury was selected despite the fact that three more Negroes remained on the panel and that petitioners had not exhausted their peremptory challenges. It is clear that the petitioners might have had a biracial jury had they chosen to exercise their peremptory challenges in a different fashion.
 
 
 15
 Petitioners introduced into evidence statistics in support of an asserted prima facie showing of racial discrimination for the past ten years. The statistics reveal that varying percentages of Negroes have been selected as petit jurors in the Drew County Circuit Court and that some Negroes had served on juries where the defendants were Negroes. However, the statistics are inaccurate as some were supplied from memory of the county clerk who could not be expected to remember how many Negro jurors were on each of the lists from twenty-one terms covering a period of ten years. In addition, systematic inclusion of Negroes to attain a proportional biracial jury is forbidden. Cassell v. State of Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950). In any event, a former jury unconstitutionally selected will not invalidate the instant jury properly selected. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Bailey v. Henslee, 287 F.2d 936, 943 (8th Cir. 1961), cert. denied, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961).
 
 
 16
 The Supreme Court held in Cassell that "the Constitution requires only a fair jury selected without regard to race." Supra at 286, 70 S.Ct. at 631. Mr. Justice Clark in his concurring opinion stated: "The burden of showing facts which permit an inference of purposeful limitation is on the defendant. Martin v. Texas, 200 U.S. 316 [26 S.Ct. 338, 50 L.Ed. 497] (1906)." Supra at 297, 70 S.Ct. at 637. Petitioners have failed to meet this burden as the record evidence does not show any purposeful racial discrimination, but, in fact, shows that identical standards were used by the commissioners in the selection of both Negroes and whites.
 
 
 17
 It appears that petitioners' principal objection to the method of selecting the jury is identical to one considered by Judge Blackmun in Maxwell v. Stephens, 348 F.2d 325 (8th Cir. 1965), cert. denied, 382 U.S. 944, 86 S.Ct. 387, 15 L.Ed.2d 353 (1965), and Mitchell v. Stephens, 353 F.2d 129 (8th Cir. 1965). In Mitchell, Judge Blackmun wrote:
 
 
 18
 "The defense next refers to the racial designations employed on the county poll tax book, as compelled by § 3-118, Ark.Stat. (1947), and the use of that book by the jury commissioners. The testimony is that the commissioners did not consult the poll tax book until after a prospective juror's name had been tentatively selected. This ultimate reference was necessary so that the commissioners could be sure that the persons on their list were electors, § 39-208, who in turn were persons who had paid the poll tax. Ark.Const., Art. 3, § 1; Ark.Stat., § 3-104.2. [The poll tax requirement and, consequently, its color references have since been eliminated by Amendment 51 to the Arkansas Constitution, effective January 1, 1965].
 
 
 19
 "This constitutional issue was presented and was decided adversely to the defense in Maxwell v. Stephens, supra, 348 F.2d 325. We noted there, pp. 333-334, the disturbing aspect of the use of race identification marks in the poll tax list and the possible unconstitutionality of the Arkansas statute requiring that identification. But present there, as here, was the pertinent fact that the initial selection of jurors was made apart from and independently of the poll tax list and that the latter was used only as a check to assure compliance with the elector requirement of the statute. We adhere to our decision in Maxwell on this point and hold that the defense attacked (sic) on the constitutionality of this second aspect of the selection of the jury is not sustainable." Id. at 134.
 
 
 20
 The situation discussed above is factually identical to the instant case and controls our disposition of this issue. Here, the poll tax book was used only to find out if a prospective juror had paid his poll tax and was a qualified elector.
 
 
 21
 There is no record evidence that petitioners did not have a fair trial by a fair jury in conformity with constitutional promise of due process of law.
 
 
 Arrest, Search and Seizure
 
 
 22
 Petitioners next contend that the officers had no probable cause for arrest and consequently the search and seizure of certain articles were illegal. The arrests were made without a warrant and the search and seizure were incident to the arrests.
 
 
 23
 The proper test as to the reasonableness of the belief that an accused has committed a felony is judged by federal standards. Vincent v. United States, 337 F.2d 891 (8th Cir. 1964), cert. denied, 380 U.S. 988, 85 S.Ct. 1363, 14 L.Ed.2d 281 (1965). The legal issue of probable cause must be resolved on a case-by-case basis from the individual facts and circumstances. Pigg v. United States, 337 F.2d 302 (8th Cir. 1964). The District Court held that the following facts and circumstances justified the officers' making both arrests.
 
 
 24
 Early in the morning on the day of the crime, Sheriff Towler accompanied the victim to the hospital after she had been brought to the courthouse by a Negro couple who aided her. He obtained descriptions of the petitioners and the automobile used in perpetration of the crime from the victim's escort. While at the hospital, Sheriff Towler asked a young Negro man, known to Towler, if he knew anyone who owned an automobile fitting this description. The man replied that such an automobile was owned by Orion Trotter. Sheriff Towler, accompanied by the victim's escort, her brother-in-law, and a state police captain, went to Trotter's home and found the car in the driveway. The car was identified by the victim's escort. The hood of the automobile was still warm and stains were noticed on the upholstery. Sheriff Towler then went to the front door and was admitted by Trotter, who was wearing bloodstained undershorts. After Trotter was unable to explain the bloodstains on his shorts, he was arrested and taken to the city jail and incarcerated.
 
 
 25
 Immediately thereafter this same party, accompanied by city policemen, went to the home of Trotter's girl friend, who told them that she had been with Trotter earlier that night and had left him with Albert Harris. The sheriff and those accompanying him went to Harris' home and were admitted. Upon receiving an unsatisfactory explanation from Harris as to his earlier whereabouts, the sheriff asked to see the clothes Harris had worn. Harris' clothes were stained with blood. The victim's wrist watch was found in his billfold. Harris was advised by the sheriff of his constitutional rights and then arrested.
 
 
 26
 We recently held in Schook v. United States, 337 F.2d 563, 565 (8th Cir. 1964) that:
 
 
 27
 "Reasonable grounds for suspicion when accompanied by facts or circumstances strong enough to justify a reasonably cautious man to believe the guilt of the suspect, suffice to constitute probable cause necessary for arrest without warrant." Id. at 565.
 
 
 28
 We agree with the District Court that the aforementioned facts and circumstances establish probable cause to arrest petitioners.
 
 
 29
 Since the arrests were lawful, the search and seizure incident thereto were likewise proper. The articles were discovered and seized contemporaneously with the arrests. It was also proper for the arresting officers to thoroughly search Trotter's automobile after apprehending Harris. They had previously noticed stains on the upholstery and had Trotter drive the car to the jail. The car was an instrument used in the commission of the crime. Shortly after Harris was arrested and brought to jail, the search of Trotter's car was continued. By daylight the stained upholstery was much more obvious. The search of the automobile was also incident to the arrest. See Caldwell v. United States, 338 F.2d 385 (8th Cir. 1964), cert. denied, 380 U.S. 984, 85 S.Ct. 1354, 14 L.Ed.2d 277 (1965).
 
 
 Separate Counsel
 
 
 30
 Petitioners assert that "because of the gravity of the charge and penalty involved, separate counsel was essential so that the petitioner's defense could have been fully explored and analyzed and that the state trial judge abused his discretion in not appointing separate counsel and petitioner was denied due process."[7]
 
 
 31
 There was no request for separate counsel prior to or during the course of the trial. The first suggestion that separate counsel should be appointed came after the conviction and after employment of additional counsel by Harris. The Honorable Tom L. Cashion, an experienced attorney in the judicial district, was appointed by the court to defend both petitioners.[8] At the conclusion of the state's evidence, the petitioners expressed their consummate confidence in Mr. Cashion and the manner in which he had conducted their defense.
 
 
 32
 When the case was called for trial the prosecutor announced that he would try the Harris case first, but after counselling with petitioners, Mr. Cashion agreed to consolidate the cases.
 
 
 33
 This belated attack on the discretion of the trial court is unwarranted and wholly lacking in support from the record. It is nothing more than after-thought devised to invoke every constitutional defense theoretically available.
 
 
 34
 In the habeas proceeding, Mrs. Harris, wife of petitioner Harris, testified that her husband had spells about twice a month during which times she avoided him, and on such occasions her husband was easily influenced. Harris received a medical discharge from the Navy because of epilepsy. It is asserted that he was confined in a government mental institution for a short while. Actually, the "short while" was years ago and for less than a day. It can be assumed only that petitioner Harris is attempting to raise the defense of insanity.[9] However, both petitioners were found to be without psychosis after a thirty-day observation period and examination at the Arkansas State Hospital.
 
 
 35
 In answer to the argument that petitioners' counsel did not have time to prepare an adequate defense, we point out that competent counsel was promptly appointed and had numerous conferences with petitioners. In addition, the prosecutor furnished petitioners' counsel with all the state's evidence against petitioners. The prosecutor testified at the habeas proceedings:
 
 
 36
 "Q. Did you furnish the defense counsel with your file and talk to him about the investigation you made and the reports made to your office and your witness?
 
 
 37
 "A. I cooperated with him a hundred per cent and informed him of all the evidence that I had and made my file open to him.
 
 
 38
 "Q. Is this the practice in Drew County?
 
 
 39
 "A. That has been my practice since I have been Prosecuting Attorney."
 
 
 40
 The Supreme Court in Avery v. State of Alabama, 308 U.S. 444, 447, 60 S.Ct. 321, 84 L.Ed. 377 (1940), affirmed the death sentence where the attorneys had only three days to prepare their defense. See also Joseph v. United States, 321 F.2d 710, 713 (9th Cir. 1963). The eminent defense attorney not only had ample time to prepare his defense and consult with his clients and others, but had the benefit of the complete state investigation even though the state is not required to furnish its file.
 
 
 41
 Finally, it is argued that separate counsel was necessary to avoid a conflict of interest. No attempt was made to show the conflict, and one does not appear to exist. Both elected not to take the witness stand after an extensive discussion with their counsel. Petitioners cite Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942) and Case v. State of North Carolina, 315 F.2d 743 (4th Cir. 1963). The facts in both are obviously distinguishable.
 
 
 42
 Both the Arkansas Supreme Court and the District Court rejected this assertion of error, and we do likewise as the claims made are utterly without merit.
 
 
 Validity of the Death Sentence
 
 
 43
 Petitioners argue that the imposition of the death penalty for the crime of rape violates the Eighth and Fourteenth Amendments to the Constitution of the United States, as those amendments guard against cruel and unusual punishment; and that there has been a disparity in the enforcement of the Arkansas rape statute. Petitioners assert that they are the only Negroes charged in the Drew County Circuit Court for rape of a white woman within the past ten years, and during that period no other defendants have been assessed the death penalty. Full and complete answers to both petitioners' arguments are found in our recent opinions in Maxwell v. Stephens, supra, and Mitchell v. Stephens, supra. And we add, as did Judge Blackmun in Mitchell, supra, 353 F.2d at 135, that the victim here is not one whose life was not "endangered" in the language of the dissenter in Rudolph v. Alabama, 375 U.S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963).
 
 
 44
 Review of the trial court and habeas records reveals no evidence supportive of petitioners' assignments of error and clearly illuminates the fact that petitioners were afforded a fair and impartial trial, and their constitutional rights meticulously safeguarded throughout.[10]
 
 
 45
 The judgment of the District Court is in all things affirmed.
 
 
 
 Notes:
 
 
 [1]
 Bailey v. Henslee, 287 F.2d 936 (8th Cir. 1961), reversed and remanded because of improperly selected jury
 Henslee v. Stewart, 311 F.2d 691 (8th Cir. 1963), reversed and remanded because of improperly selected jury.
 Mitchell v. Stephens, 353 F.2d 129 (8th Cir. 1965), reversed and remanded for an independent hearing on the voluntariness of Mitchell's confession, following teachings of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).
 Maxwell v. Stephens, 348 F.2d 325 (8th Cir. 1965), denial of habeas petition affirmed, based on finding neither discriminatory enforcement of the Arkansas rape statute; nor an improperly selected jury; nor an illegal search and seizure.
 
 
 [2]
 Identical orders were entered as to each petitioner as follows:
 "Now on this 17th day of February, 1963, the above defendant, Albert Harris, being held in the custody of the Sheriff and of this Court on charges of Rape, Robbery and Assault with Intent to Kill, and in order to preserve the peace and for the protection of said defendant himself, it being the best judgment of the Judge of this Court and the officers that he be transported to the Arkansas State Penitentiary for his own safekeeping and to preserve the peace to be held there for a short period pending further orders in his cases."
 
 
 [3]
 "They had been arrested after a five hour manhunt. * * * The two identified by Drew County Sheriff Jack Towler, as Orion Trotter and Albert Harris, both of Monticello, were transferred to the State Penitentiary for security reasons."
 
 
 [4]
 Defense counsel, at trial inception, filed written motions for a closed hearing on the entire case
 
 
 [5]
 The state trial judge characterized the trial as follows:
 "This was the case of a jury composed of average American men and women applying the law to the evidence and returning verdicts in conformity with the law and the evidence. There is no doubt in the mind of this Court that had the same acts reflected by the evidence been committed by any other persons, be they white or any other race, the same penalty would have been exacted by any fair minded jury." (State court record at pages 318-319.)
 
 
 [6]
 The trial court denied both petitioners' motion to quash the jury panel and their motion for new trial, after evidentiary hearings in both instances. The Supreme Court of Arkansas thoroughly examined the issue in Trotter v. State, 237 Ark. 820, 377 S.W.2d 14 (1964), as did the federal District Court in Trotter v. Stephens, 241 F.Supp. 33 (1965)
 
 
 [7]
 This quotation is from Harris' brief, and incorporated in Trotter's brief by reference
 
 
 [8]
 Mr. Cashion was more experienced in this type defense than any attorney in the judicial district. Unquestionably, petitioners had the effective assistance of able counsel
 
 
 [9]
 Petitioners, by invoking the attorney-client privilege, prevented admission of evidence revealing extent of exploration and voluntary rejection of this defense at trial
 
 
 [10]
 In No. 18,062, Harris v. Stephens, etc., the order of April 30, 1965 entered by the United States District Court for the Eastern District of Arkansas granting the State of Arkansas seven months from that date to conduct a hearing on the issue of voluntariness of certain alleged statements made by appellant or to retry him was by this court ordered stayed for a period of four months from the filing of the mandate of this court with the Clerk of the United States District Court for the Eastern District of Arkansas