BOBO *v.* STATE.

Opinion delivered March 18, 1929.

*Hays, Priddy & Rorex,* for appellant.

*Hal L. Norwood,* Attorney General, and *E. F. McFaddin,* Assistant, for appellee.

KIRBY, J. This appeal is prosecuted from a conviction of appellant of the crime of murder in the second

degree for killing one Sam Dean, with punishment fixed at 12 years in the penitentiary.

Only two assignments of error are urged; first, that the court erred in permitting the introduction of testimony in rebuttal tending to impeach the defendant's statement; and second, that error was committed in allowing a witness to state his opinion, after examination of the place where the shooting occurred, that it was impossible that shot from one discharge of the gun could have struck the deceased on the ground, cut certain twigs from the bushes where he left the road, and struck the end-gate of his wagonbed.

Appellant and deceased were colored men, farmers, about 40 years of age, living in the same community, about five miles south of Atkins, and about a mile apart. They had been friends from boyhood, belonged to the same lodges and church, and had had no trouble before this difficulty. They were both at church on Sunday before the killing on the next Friday, and agreed that they would attend church together on the next Sunday. Dean was to come by for appellant on Sunday morning.

Richard Bobo, cousin of defendant, and brother-in-law of deceased, spent Saturday night at Dean's home, and he and Dean began drinking "home brew" Sunday morning, and about 9 o'clock they went to defendant's home and continued drinking "home brew." They left defendant's home at about 12 o'clock with another neighbor, Alex Pledger, and went to Dean's home, where Dean served more "home brew." All were drinking, and Dean went into the house and engaged in a controversy with his wife. Defendant went inside, being helped by Richard Bobo to take Dean out of the house, which they did. They took Dean's shotgun away from him, and also a target rifle, his wife saying at the time that Dean was getting his gun to shoot the defendant. When they got outside, defendant asked Pledger to hold Dean, and ran on down to his own home. Dean quieted down, and there seemed to have been no ill will between them or

any ground for a quarrel, except condition from drinking. Defendant went home, got his shotgun, and started to Cuba, a negro settlement about three miles away, after his wife. Shortly after leaving home he met Dean with his two companions walking up that way. They spoke to each other in passing, and defendant fired his gun in the air shortly after passing the others.

On Friday morning afterwards both men started early to the gin with a load of cotton, Dean being ahead of appellant, on the same road, and neither knowing of the other's presence. After leaving the Atkins highway, Dean stopped to talk with a colored neighbor, and appellant drove up within about twenty-five yards, and the two engaged in a friendly conversation about their crops and the amount of cotton picked. Dean drove on, with the defendant following. This was about a half-mile from the scene of the killing. Dean's team was the faster, and he was about 75 yards ahead of defendant when they passed Walker's house. He continued to gain, and was about 200 yards ahead when he stopped where the killing occurred. The neighborhood is thickly settled along the road, a State highway, to the cotton gin, except about 250 yards of the road where the killing took place has thick woods on each side and a high bank on the left, an old river-bed, where sand was being taken out for construction work. There was an "S" curve in the road here, with no view of that portion of it from any house along the road. Dean was ahead of appellant, stopped his wagon, and, according to defendant's statement, waited until he drove up. Said he could not drive around Dean's wagon, his team being cut across to the right, and the hole from which the sand was being taken was on the left. When defendant got within about 30 feet, Dean stopped his wagon, wrapped his lines on the sideboard, and started back toward the end of the wagon, telling the defendant it was a good time to settle their differences of last Sunday, at the same time putting his hand into the bib of his overalls and coming towards defendant, who was sitting on his load of cotton.

When he started to take his hand out, defendant grabbed his shotgun and fired at Dean, hitting him in the breast. Both teams started to run, and both men either fell or jumped from their wagons, deceased landing first. As appellant fell or jumped, the gun was discharged a second time, just as deceased had turned and started to run. This shot struck the deceased in the hip, and also struck the hind-gate of his wagon. Deceased ran down the right side of the road 25 or 30 steps, turned off into the old road through the bushes at the edge of the road, and fell about 15 steps from the turn-out, where the body was found. Defendant ran after his team, going in the direction of the gin, following the team of the deceased. At the north end of the curve the highway turns directly east to the gin about a quarter of a mile way, and defendant, not having overtaken his team, continued north to the town of Atkins, about one and a half miles, and surrendered to the officers, telling them he had shot Dean. Denied that his gun was concealed, and said he had carried his shotgun for protection against robbers, as he was going to bring the money home he received for his cotton, and his brother-in-law had been robbed a few days before on the road.

Dean, when killed, was dressed in overalls and jumper, the bib of his overalls over his jumper. He was shot in the face, side, head and back with No. 4 shot, and no weapon was found on or near the body. One witness said there were some shot in one of his hands.

Odis Austin, on his way to the gin with some cotton, first saw the wagons of defendant and deceased about one-half mile from the killing, and did not then know which was in front. Did not see Bobo's wagon stop on the left side of the road at the bend. Was a good piece behind, "but Bobo was on the front end of the wagon, facing the right side of the road, and I saw him pick up his shotgun and shoot twice. A piece of sack or wagon sheet or something was over his gun. He pointed it south, or to the right, and shot. He didn't seem to be

excited, but put the gun to his shoulder, and I think he took aim. The gun was pointed down, a little out, and he shot twice. His second shot was about the same range as the first. He never took the gun down from his shoulder. His team started to run with the first shot; about ten seconds between the shots, and his team was going when the second fired. Did not see what he was shooting at. When I drove by the place where his wagon had been, there was some cotton and a hat on the ground at the right side of the road. The hat was on the cotton, and the cotton was scattered along three or four feet. Did not stop my team, and, when I got around the bend of the road, the teams were going on to the gin, but I didn't see any drivers. When I got about 250 yards beyond the place of the killing, I saw Simpson Bobo going through the cotton patch in the direction of Atkins, and he had his gun with him.'' Witness was about 150 yards from Bobo's wagon when he first saw it, and about 75 yards distant when the shots were fired. Bobo's wagon was not moving while witness drove the 75 yards, and he did not shoot down, but across the road. Could not see Dean's wagon at all, but there was shot in the back of it. The road runs east and west, and Bobo was on the north side, with his gun pointed south. Could not see which way the wagons were facing. There was no wagon between witness and Bobo's, and he was in the same position when he shot the second time, not changing the range of his gun, which was across the road, and down.

The constable testified that he made a thorough examination of the place of the shooting about two hours after it occurred; found no weapon on the body of the deceased nor in his wagon. Some shots were in the back of his left hand. Did not know whether there were any shots in his right hand. Was shot from the navel up as high as the mouth. Saw some tracks on the side of the highway that came down aways and turned into the bushes, which were shot, and had blood on them about

six or seven steps from where the body was lying. It was about 24 or 25 steps from where the first tracks were off the wagon to where he turned off the highway. There was blood on the bushes and on the road. Found 16 shot in the back of Dean's wagon, which would be on the south side of the wagon, traveling east, and the shot ranged down. It was about 64 feet to where he turned off in the bushes and where the shot had struck the bushes. Witness was asked the question, from where he saw the tracks and the blood, if shot from the same load could have hit the wagon and cut the bushes 65 or 75 feet away, where the tracks turned in. This question was objected to, and the court first refused to allow the witness to answer; later, on his own motion, the court said he thought he ought to be permitted to answer the question, since he was on the ground, and the situation could be better understood if he would do so, to which witness replied, ''It would be impossible.'' Did not know from where the shot was fired that cut the bushes or struck Dean, nor where Dean was standing when shot, or where the wagon was standing when the shot struck the endgate. It would have been impossible for shot fired from the same load to have struck a man where the blood started and also to have struck the bushes down there. The range of the bullets in the body was slanting a little down and to the right, and they were pretty straight in the wagon-bed.

Alec Standridge was allowed to testify in rebuttal of a threat made by the defendant, after defendant had denied making such statement, that defendant had not said that on the day before the killing he was at a man's house on Sunday before that, and that ''for ten minutes he would kill him.'' Said he did say that he was at a neighbor's on Sunday before that, and that the fellow, the first thing he knew, was getting a gun to kill him with, and says, ''For a little I would take my gun and kill that sucker yet.'' That is all that he did say.

The proper predicate was laid for the impeachment of the defendant's testimony by showing his contradictory statements made to the witness. Section 4187, C. & M. Digest; *McCoy* v. *State*, 46 Ark. 141; *Cook* v. *State*, 109 Ark. 384, 160 S. W. 223; *Pinkerton* v. *State*, 126 Ark. 201, 190 S. W. 110. It was within the sound discretion of the trial court to allow the introduction of testimony in rebuttal anyway, notwithstanding it had been better if regularly introduced. Section 3173, C. & M. Digest; *Walker* v. *State*, 100 Ark. 182, 139 S. W. 1139.

We find no abuse of discretion in the court permitting the introduction of this testimony at the time.

Neither was error committed in allowing the witness Kimberling, after stating in detail the conditions discovered at the place of the killing, to say that, in his opinion, it was impossible for shot from the same charge to have struck defendant where the tracks began on the ground, and to have cut the bushes at the side of the road sixty feet away, where the tracks left the road, and to have gone into the end-gate of deceased's wagon. This was a question about which a nonexpert witness could testify, and, having stated in detail the point of beginning of the tracks of the deceased and of the bushes 70 feet away, cut by the shot, where deceased turned out of the road, and of the range of the shot in the body of deceased and in the wagon-bed, that it was impossible for the shot fired from the same charge to have struck as indicated. This was a conclusion of fact taken from the appearances in reference to an ordinary transaction which any man of common understanding was capable of comprehending, although it could not have been reproduced or described to the jury precisely as it appeared to the witness, and, if there was no right to insist upon an expression of the opinion of the witness under the circumstances, it was not reversible error to permit it done. See 11 R. C. L 593, 635, 22 C. J. 564; *Ford* v. *State*, 52 Ark. 180, 11 S. W. 959, 20 A. S. R. 163.

We find no prejudicial error in the record, and the judgment is affirmed.