LACY v. STATE

5154                                                   398 S. W. 2d 508

Opinion delivered January 24, 1966

[Rehearing denied February 21, 1966.]

*George Howard, Jr.* for appellant.

*Bruce Bennett,* Attorney General; *Richard B. Adkisson,* Chief Asst. Atty. General and *Fletcher Jackson,* Asst. Atty. Gen.

Ed. F. McFaddin, Justice. Ervin Lacy was charged, tried, and convicted of the crime of rape (Ark. Stat. Ann. § 41-3401 [Repl. 1964]), and sentenced to life imprisonment. His motion for new trial contains eight assignments, which his counsel has grouped into four points.

## I.

Point No. 1 is: "The trial court erred in overruling appellant's motion to quash the petit jury panel because of racial discrimination in the selection of the jury panel in Phillips County, Arkansas." The appellant is a Negro and he claims that Negroes were discriminated against in the selection of the petit jury panel. He showed that the list of petit jurors for the term of the court at which he was tried contained 34 names, and that five of those on the list had the letter "C" after his name, and that such letter indicated that such person was a Negro. On this showing appellant claims that racial discrimination existed in the selection of the jury panel; and he cites these cases: *Avery* v. *Georgia,* 345 U. S. 559, 97 L. ed. 1244, 73 S. Ct. 891 (1953); *Bailey* v. *Henslee,* 287 F. 2d 936; *Cassell* v. *Texas,* 339 U. S. 282, 94 L. ed. 839, 70 S. Ct. 629; and *Anderson* v. *Martin,* 375 U. S. 559, 11 L. ed. 2d 430, 84 S. Ct. 454. We had a similar contention before us in the recent case of *Sheppard* v. *State,* 239 Ark. (Adv. Sh.) 785, 394 S. W. 2d 624, and we there said: "The single point in counsel's argument that finds support in the proof is the fact that the electors were designated by race in the list of qualified voters. Our attention is directed to *Avery* v. *Georgia,* 345 U. S. 559, 97 L. ed. 1244, 73 S. Ct. 891 (1953); but the Court did not hold that such a practice is, in itself, sufficient to establish discrimination in the selection of the jury."[1]

---

[1] The matter of racial discrimination in selection of the jury panel was considered by us in these cases: *Dorsey* v. *State,* 219 Ark. 101, 240 S. W. 2d 30 (certiorari denied 345 U. S. 956); *Lillard* v. *State,* 236 Ark. 74, 365 S. W. 2d 144; and *Trotter and Harris* v. *State,* 237 Ark. 820, 377 S. W. 2d 14. There are annotations on this matter in 2 L. ed. 2d 2041; and 97 L. ed. 1249. We have also studied *Swain* v. *Alabama* (1965), 380 U. S. 202, 13 L. ed. 2d 759, 85 S. Ct. 824.

We find no merit in this point urged by the appellant. Any argument of racial discrimination in the selection of the jury panel in this case was clearly dispelled by the testimony of the Jury Commissioners, each of whom was called by the appellant. Commissioner Howe testified:

"Q. Taking that into consideration did you all seek to include any Negroes?

"A. I don't know whether we included them—whether we sought to include them—we left race out of it, we were picking people, not color."

Commissioner Horner testified:

"Q. How is it you came up with five Negroes and the rest of them white?

"A. I can't tell you that. There were instructions that we were given; we were not told to pick all Negroes or all whites, we were told to pick a qualified jury panel and that is what we attempted to do. . . .

"Q. In the selection of the jury, in consideration of the Court's instructions, did you include or exclude any person because of his race, color or creed?

"A. No, sir.

"Q. Then explain to this Court why it is that you come with five Negroes and the rest of the twenty-four regular and the alternate twelve are white?

"A. I was not obligated to put anybody on the jury panel. I can't tell you why there was one Negro, three Negroes or five selected; we had

no obligation to pick a certain number of any race or group of people.''

Commissioner Kemmer testified:

''A.    I didn't have any instructions to put—to pick —any particular person on this jury. My only instruction was to select somebody that I would be willing to have try a case of mine. If it was left up to me individually there are colored people that I would not object to trying my case.''

This quoted evidence—and it is practically undisputed—clearly shows that the Jury Commissioners entirely disregarded the matter of race in selecting the jury panel.

## II.

Appellant's second point is that there should have been an instructed verdict for the appellant; and appellant's fourth point is that the verdict is not supported by such evidence. We consider these two points together. The prosecuting witness was a widow, who, with her 6-year-old boy lived in an apartment. When the prosecutrix returned home from work about 9:00 P.M. the maid was with the little boy. She let the maid leave; and she and her son retired shortly after 10:00 P.M. Then some time in the night an intruder threw an apron over her face. She testified:

''I struggled with him and he choked me until I couldn't hardly move. He told me to turn over on my stomach and I did and he tied my hands behind me and then he turned me over and started demanding money and I told him I didn't have any money and he said I was lying. He told me if I didn't do what he wanted me to he was going to kill me and my child. I got up. I had my purse in the kitchen, I told him; and on the way I asked him for a

drink of water and he took me into the kitchen and he got me a drink of water.

"Q. Let me stop you there. Were there any lights on the house at that time?

"A. Yes, sir, the big kitchen light was on, . . .

"Q. What happened when you got in there?

"A. I saw this boy and then I got scared because he had nothing over his face and he gave me a glass of water and I took him to my purse and he got the money out of my purse.

"Q. You say that was located on a chair in the hallway?

"A. Yes, sir.

"Q. All right?

"A. He got the money and he said I had more than that and I told him that was all I had. He then threw me down on the cot and took off my pajamas.

"Q. Is that the cot in the living room?

"A. Yes, sir, and he threw me down and raped me.

"Q. Did he actually have intercourse with you there?

"A. Yes, sir, he had the apron around my throat. . .

"Q. Then what happened?

"A. He took me in—He took me back and threw me on the cot and he raped me again and my son woke up, and he got very angry, he told my son to shut up or he would kill his mother.

He got me up and during that time he took me back over on the bed; and he had put his own pants on, and he got to the bed and he threw the cover on me, over me and my son's head and he said, 'If you call the police,' that he would come back and kill us both, then he left. . . .

"Q. Do you remember how the defendant was dressed?

"A. He had on a cream colored knit sweater and tight type pair of pants.

"Q. Could you tell whether they were blue denim or serge?

"A. No, sir, but I remember the yellow sweater.

"Q. You say he took off his pants?

"A. Yes, sir.

"Q. Do you remember giving any description to the police later?

"A. I remember later, I remember telling them he was a very-very young boy. . . .

"Q. You have testified to us what happened there that night on two occasions that particular night. Actually, was there penetration?

"A. Only a slight one, more or less the pounding of his body and the way he treated me.

"Q. But you say there was slight penetration?

"A. Yes, sir."

After the rapist left, the prosecutrix and her son immediately called the police, who took her to the hospi-

tal where she remained a week because of her nervous condition. She definitely identified Ervin Lacy as the rapist. It was shown that entrance to her apartment had been gained by removing a screen from the kitchen window. The police officer who received the call the night of the rape testified:

"I received the call on the police radio at 11:25 P.M. and I went to 905 Perry Street and there I found [the prosecutrix] sitting in a chair in the front yard of 905 Perry. She had an apron around her neck and her hands were bound very tightly behind her with a piece of clothes line, plastic covered. I tried to untie the knots and it was tied so tight I couldn't, and I took my knife and cut it."

The doctor who examined the prosecutrix at the hospital testified:

"Q.    What was her condition?

"A.    She was bruised around her neck and was somewhat swollen and there was some redness about the vagina.

"Q.    From your examination of these bruises, were they of recent origin?

"A.    They were recent, yes, sir.

"Q.    They were in the area of the neck?

"A.    Yes, sir, on both sides.

"Q.    Were they of the type that could have been caused by choking with the hands?

"A.    Yes, sir.

"Q.    You said there was some redness or irritation in the vagina?

"A. Yes, sir. . ."

Officer Smith, who arrested the appellant that night, testified as to the clothing which the appellant had on at the time of the arrest. The appellant testified in his own behalf. He denied that he was the person who had committed the alleged crime and claimed that he was elsewhere. He named three persons who were with him from 6:00 P.M. to 11:00 P.M. at a carnival; but only one of them testified in support of his alibi.

We have sketched enough of the testimony to show that the Court was correct in denying the motion for an instructed verdict and also in ruling that the verdict was supported by the evidence. The questions of identification and alibi were for the jury. The evidence was sufficient as regards penetration. *McDonald* v. *State*, 225 Ark. 38, 279 S. W. 2d 44. The prosecuting witness testified as to the rape; and we have repeatedly held that her testimony does not have to be corroborated. *Bradshaw* v. *State*, 211 Ark. 189, 199 S. W. 2d 747; and *Bailey* v. *State*, 227 Ark. 889, 302 S. W. 2d 796. Even so, she was in fact corroborated on many matters.

### III.

Appellant's final point relates to the ruling of the Trial Court in permitting the prosecuting witness to testify, on rebuttal, relative to a jacket allegedly worn by the appellant. The appellant says:

" . . . the alleged victim, testified that her attacker had on a cream colored sweater and tight pants; she made no reference whatsoever about a coat or jacket. After the appellant and his witnesses had taken the stand and testified that on the night of November 12th, that appellant had worn a blue jacket, the trial court, over the objections and exception of appellant, permitted the prosecuting witness to testify on rebuttal to the effect that appellant was wearing a coat or a jacket."

92

Our statute (Ark. Stat. Ann. § 43-2114 [1947]) says:

"The parties may then respectively offer rebutting evidence only, unless the court for good reason, in furtherance of justice, permit them to offer evidence upon their original case."

This statute permits the Court, "for good reason, in furtherance of justice," to allow the State to reopen its case and offer new evidence. Even if the recalling of the prosecutrix to testify about the jacket which the defendant wore could be considered as new evidence, still the Court had a right to allow such to be offered; and the Court did not abuse judicial discretion in such ruling. *Walker* v. *State*, 100 Ark. 180, 139 S. W. 1139; *Bobo* v. *State*, 179 Ark. 207, 14 S. W. 2d 1115.

Finding no error, the judgment is affirmed.

COBB, J., not participating.