JESSE SHELTON *v.* STATE OF ARKANSAS

CR 73-62                                   496 S.W. 2d 419

Opinion delivered July 2, 1973

*James K. Young,* for appellant.

*Jim Guy Tucker,* Atty. Gen., by: *O. H. Hargraves,* Deputy Atty. Gen., for appellee.

CONLEY BYRD, Justice. This matter was previously before us, see *Shelton v. State,* 251 Ark. 890, 475 S.W. 2d 538 (1972), wherein we reversed a life sentence conviction for error in the admissibility of a confession. On remand, appellant Jesse Shelton was again convicted of rape but this time his punishment was fixed at 30 years imprisonment. For reversal he contends:

"1. That the court erred in its refusal to quash the jury panel for the reason that the names of the persons on the jury list were disclosed in violation of Ark. Stat. Ann. § 39-201 (Supp. 1971);

2. The court erred in refusing to quash the jury panel for the reason that 96 names were drawn from the jury wheel for reasons other than to serve members of the petit jury;

3. The court erred in refusing to allow the withdrawal of James K. Young, Court appointed attorney for defendant, for the reason that there was a conflict of interest in this matter;

4. The court erred in refusing to grant a continuance for the reason that William Bud Campbell, an eye witness to the alleged offence, was not present, and

5. That there was not sufficient evidence presented to the jury to allow them to find appellant guilty."

The record shows that Jesse Shelton, Clinton Holt, Joe Hilderbrand and Howard Vanderpool were jointly charged in the rape of the prosecutrix. The particular allegation as to Joe Hilderbrand being:

"That the said Joe Hilderbrand brought himself and the other defendants in the car owned by Joe Hilderbrand to the scene of the rape and stood by, aided and abetted in said rape."

The prosecutrix testified that she and her date, Bud Campbell, had parked at the scene of the rape in a pickup truck. While they were listening to the radio and talking, a man came up and said, "alright, Buddy, open the door." The assailant had another man watch Bud while he made her lay on the ground and raped her. When she first reported the matter to the officers, she described her assailant as bald, gray, and fifty years old. At the trial she positively identified Shelton as her assailant even though he was neither bald, gray, nor fifty.

Joe Hilderbrand testified that he took Shelton and Clinton Holt to Newton County to buy some beer. On

the way back, he had a flat. Shelton, Clinton Holt and the other boy walked off while he fixed the flat. They came back about the time he got the flat fixed.

Before the commencement of the trial, Shelton's court appointed Counsel, in an effort to withdraw as counsel, caused the following record to be made:

"MR. YOUNG:

I renew my motion I made at the first of the trial, that the State has subpoenaed Joe Hilderbrand, and I have always represented Mr. Hilderbrand, and I am now, with Mr. Williams, court-appointed in another matter. I have information from Joe I received in a confidential source; and I made this known to the Court prior to this first trial; and I again request that I be allowed to withdraw and the Court appoint additional counsel.

MR. STREETT:

The case Mr. Young referred to that he is associated in, the facts have no connection with the facts in this case, and the State feels there would be no conflict.

MR. YOUNG:

Of course, Mr. Streett has a short memory. The case I am referring to is the State of Arkansas vs Clinton Holt, Jessie Shelton, Joe Hilderbrand, and Harold Vanderpool. The prosecution has thrown out Hilderbrand in this case, for which I am happy, but I have information obtained in a confidential manner, and I would not be free on cross examination of Mr. Hilderbrand if he is called to testify.

THE COURT:

Mr. Williams could cross examine.

MR. YOUNG:

He is not in this case.

THE COURT:

I don't believe that is such a conflict of interest that would jeopardize this defendant's rights.

MR. YOUNG:

You have me muzzled, Judge.

Communications between attorney and client are privileged under the laws of Arkansas, Ark. Stat. Ann. § 28-601 (Repl. 1962). All textbooks on the subject of attorney and client point out that an attorney must faithfully, honestly and consistently represent the interests of his client and that he may not divulge to others confidential communications, information and secrets imparted to him by his client during their professional relation. See 7 Am. Jur 2d, Attorneys at Law § 93 and 7 C.J.S., Attorney and Client § 125. See also the Annotation in 34 A.L.R. 3d 470. Most of the authorities take the position that doubts as to effectiveness of respresentation should be resolved in separate representation of counsel where an informed speculation of conflict exists. As the Court in *Lollar* v. *United States,* 126 App. D. C. 200, 376 F. 2d 243 suggested, an informed speculation as to apparent conflicting interests, like the tip of an iceberg, may not reveal the whole story. Consequently, we must hold that the trial court erred in refusing to permit the appointed counsel from withdrawing because of the apparent conflict of an adverse interest.

Having found prejudicial error on the one point, we next take up those issues that are apt to arise on a new trial. We find no merit in the suggestion that the evidence was insufficient or that the trial court erred in denying a continuance because of the absent witness on the showing here made. The matter of the quashing of the jury panel is hereinafter discussed.

The record shows that the jury Commissioners in the preparation of their list of prospective jurors did not include the last known addresses as required by Ark. Stat. Ann. § 39-206 (Repl. 1962), and that a deputy clerk, not sworn in accordance with Ark. Stat. Ann. § 39-205 (Repl. 1962), took over the list and filled in the addresses

before the master list was placed under lock and key. The record further shows that the Chancery Judge in trying some eminent domain cases on the 11th day of September 1972, withdrew 36 names for use in the Chancery Court and again on September 25th withdrew an additional 60 names for similar use in another case. Since only the circuit clerk and the circuit judge have keys to the jury wheel and both such keys are necessary to gain entrance to the jury wheel, the circuit judge was present when the chancellor withdrew the 96 names. The 96 names withdrawn by the chancellor were not placed in the Jury Book, but, after their use, those names were placed in what the officials called "discards" or "dead jurors"—meaning that they were no longer available for call.

In *Horne* v. *State*, 253 Ark. 1096, 490 S.W. 2d 806 (1973), we held that, due to the many successful attacks that were being made upon our jury selections in post conviction proceedings prior to Acts 1969, No. 568, we could not construe the Act as directory—*i.e.*, the procedure therein outlined is mandatory when the challenge is made at the proper time.

Since Act 568 takes pains to protect the secrecy of the master jury list and specifically provides that clerical employees used in the preparation of the alphabetized master list shall take a specific oath to that effect, we must hold that the use of unauthorized personnel did not comply with Act 568.

Courts like Caeser's wife must be above suspicion and while we do not wish to discourage chancellors from the use of a jury, we find that the method here used did not comply with Act 568.

Section 18 of Act 568 (Ark. Stat. Ann. § 39-210) provides that the number of jurors drawn and placed in the Jury Book as provided by Section 17, shall be ". . . summoned to appear on a date set by the Court to answer questions concerning their qualifications; and, . . . to serve the required number of days or for the maximum period during the calendar year. . . ." The method here used in selecting and discarding jurors for use in the chancery court could lead to the suspicion that the courts

are using one jury for criminal cases and another for civil cases. In holding that the refusal to quash on this ground was contrary to the spirit and intent of Act 568, we are not saying that it is error for the chancery court to borrow jurors for the trial of issues in equity. Furthermore, we are not condemning such practice. Rather, the better procedure, as it appears to us, would be for the chancery court to take its jurors from the list on the Jury Book and to return them for future use in other trials, being the same procedure required of the circuit court. When the selection is done in that manner both the circuit and chancery courts are above all suspicion in the manipulation of the jury wheel for civil and criminal trials either through selection in the first instance or through the discretionary use of skipping or excusing jurors. We are led to this conclusion because one of the checks on the credibility and integrity of the jury wheel is the requirement of Ark. Stat. Ann. § 39-209 (Supp. 1971), that the circuit judge "not less than 15 days prior to the first jury trial in the year for which the prospective jurors have been selected . . . shall enter an order which shall be spread of record stating a time and place for the initial drawing of the names of petit jurors from the jury wheel or box." This section also requires that the circuit clerk record the names in the Jury Book in the same order in which they are drawn from the wheel. Ark. Stat. Ann. § 39-213 (Supp. 1971), sets forth the procedure of choice of jurors when an excess number has been drawn and listed in the Jury Book and specifically mentions the order as being the same order as they appear in the Jury Book.

Reversed and remanded.