Winston M. HOLLOWAY, Ray Lee WELCH and Gary Don CAMPBELL *v.* STATE of Arkansas

CR 76-25                    539 S.W. 2d 435

Opinion delivered July 19, 1976

[As Amended on Denial of Rehearing September 20, 1976.]

*Harold L. Hall*, Public Defender, for appellants.

*Jim Guy Tucker,* Atty. Gen., by: *Gary Isbell,* Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. Appellants, Winston Holloway, Ray Lee Welch and Gary Don Campbell, were charged by information with robbery of the Leather Bottle Restaurant in Little Rock on June 1, 1975, and with the use of a firearm in committing the offense. The three men were further charged with the rape of two female employees of the restaurant. Following a jury trial, all three men were convicted, with punishment for each set at 21 years imprisonment for the robbery, and life imprisonment for rape. From the judgment so entered, Holloway, Welch, and Campbell appeal, arguing several points for reversal.

For convenience, we first discuss the last point which is simply that the court erred in not giving instructions for directed verdicts of acquittal. While appellants concede that any possible error was cured by the giving of the state's instruction defining an accessory, we proceed to a discussion of the contention as a matter of providing background for other points asserted.

Other than the identity of the perpetrators, the facts about the robbery-rapes are not disputed. After the closing of the Leather Bottle on June 1, around 1:30 - 1:45 A.M., five employees had remained in the restaurant, and were preparing to leave. The employees were Donald Henry, Michael Garrett, David Carroll, and two women. All five were in the restaurant office in the lower part of the building.

As one of the women (hereafter called "first woman") began to leave, she heard someone running down the stairs toward the office. When she looked, she saw a man — whom she subsequently identified as appellant Holloway — coming down the stairs, brandishing a .45 caliber automatic pistol. She also saw two other men at the top of the stairs. Holloway forced her back into the office at gunpoint, where he herded her and the four other employees against the wall, threatening to kill them if they moved or opened their eyes. At this point one of the employees, Donald Henry, saw appellant Welch, also in the office, rifling the other woman's (hereafter called "second woman") purse.

While one of the other men remained in the office with the employees, Holloway grabbed the second woman by the arm and took her outside, to the stairs, where he forced her to disrobe, and then raped her. She was thereafter raped a second time by another man, but was unable to identify the assailant. Holloway subsequently returned to the office and asked which employee could open the safe. David Carroll, manager of the restaurant, said that he could, and Holloway directed him to do so. While this was occurring, another of the three men came into the office and forced the first woman out to the stairs, where he took all the money from her purse, and then raped her at gunpoint.

Subsequently, after getting all the available cash from the safe, the three men again made all the employees face the office wall, eyes closed, while they "shot out" the telephones with gunshots. The employees were then grouped into the restaurant's walk-in freezer, which was then locked. After about an hour — around 3:30 A.M. — one of the employees, Michael Garrett, escaped from the freezer by a small service opening, and released the others. The police were called, and the women taken to a doctor.

Because the robbers kept them facing the wall, and instructed them to keep their eyes closed, none of the employees were able to identify all three men. The first woman and Donald Henry identified Holloway and Welch. Michael Garrett could identify only Holloway. The second woman and David Carroll identified Holloway and Campbell.

In addition to the testimony of the five employees, the state also presented evidence of a statement given by appellant Campbell to two police officers, Paul Plummer and Jerry Best. The officers testified that on July 4, 1975, they received information that appellant Campbell was being held in the city detention center, under the alias Robert Hill. They removed Campbell from detention, showed him a warrant charging him with robbery, and began taking him to an interrogation room. At this point both officers testified Campbell spontaneously said, "I haven't raped anyone. I will tell you about the robbery." The officers said that they cautioned Campbell to stay silent, because he had not been warned of his rights, but that he immediately volunteered the

same statement again.

Thereafter Campbell was warned of his constitutional rights, and both officers stated that he signed a "rights waiver," which was admitted into evidence. Plummer and Best testified that Campbell then told them that he, Welch and Holloway had robbed the establishment. The officers said that Campbell admitted complicity in the robbery, but denied raping anyone, stating that he had held a rifle and had stood at the top of the stairs. In the oral statement Campbell said that the men had stolen about $2,000.00, and that his share of the money was approximately $700.00. It is apparent that, aside from the concession, the court did not err in refusing to instruct directed verdicts of acquittal.

Appellants contend that the trial court "erred in refusing to grant a mistrial when the defendants were brought in court before the jury in their jail uniforms in violation of their rights under the Sixth and Fourteenth Amendments to the Constitution." Before the trial began, counsel for appellants moved for a mistrial, alleging that appellants were "paraded through the courtroom in their jail uniforms where all of the prospective jurors were seated." The record does not reflect whether any of the prospective jurors ever saw appellants prior to the trial. Nor does the record reflect the exact attire of the men except that they were dressed in matching blue trousers and blue shirts.

Appellants' argument has no merit, for several reasons. First, appellants rejected, twice, the trial court's offer to allow them to change clothes. *The trial court gave the appellants this opportunity before the trial began and before the actual selection of the jury.* Therefore, appellants may be deemed to have waived the point. Finally, in the recent case of *Estelle* v. *Williams*, 425 U.S. 501, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976), the U.S. Supreme Court held that a defendant's constitutional rights were violated only when he was *compelled* to wear identifiable prison clothing at his trial. The court stressed that such attire must be "distinctive" and "identifiable."

It is asserted that the court erred in refusing to grant appellants' motion for a severance and in not appointing

separate counsel. Prior to the trial, all three appellants moved for severance, and for appointment of separate counsel. As grounds for severance, each asserted that witnesses might be called by one of the defendants to testify against the other defendants, that a joint trial would deprive each appellant of his right to call the co-defendants as witnesses, and that a joint trial would prevent counsel from commenting on the failure of any co-defendant to testify, if such occurred. The motion for separate counsel alleged only that the appellants had stated to counsel that "there is a possibility of conflict of interest in each of their cases." The motions were denied.

Appellants' counsel renewed the motion for separate counsel at the trial, stating that "one or two of the defendants may testify and, if they do, then I will not be able to cross-examine them because I have received confidential information from them." The trial court denied the motion.

First, let us review the contention that a severance should have been granted. Let it be pointed out that appellants demonstrate no prejudice from the joint trial. As previously noted, three grounds were alleged in the motion for severance. None of these grounds materialized during the trial. Moreover, the trial court properly limited the use of Campbell's statement against the co-defendants by deleting all references by name to the other two defendants, and substituting the words, "two other people" and "two other fellows." This procedure fully complied with this court's requirements. *Gammel and Spann* v. *State,* 259 Ark. 96, 531 S.W. 2d 474 (1976); *Stewart and McGhee* v. *State,* 257 Ark. 753, 519 S.W. 2d 733, *cert. denied,* 423 U.S. 859. In fact, it was counsel for appellants who stated before the jury that the confession implicated the two co-defendants.

As this court has held numerous times, "[t]he granting of a severance is within the sound discretion of the trial court." *Keese and Pilgreen* v. *State,* 223 Ark. 261, 265 S.W. 2d 542; *Vault* v. *Adkisson,* 254 Ark. 75, 491 S.W. 2d 609. We find no abuse of discretion in the instant case.

Next, let us review the point that separate counsel should have been appointed. The applicable law was discussed in *Trotter and Harris* v. *State,* 237 Ark. 820, 377 S.W. 2d 14,

*cert. denied,* 379 U.S. 890. In a lengthy discussion the court reviewed the relevant precedents, and held that no conflict of interest had arisen because counsel represented the two co-defendants. The court stated:

> "Both men were charged with the same offense, which grew out of the same occurrence. The only evidence, which in any manner could be said to indicate a conflict of interest, was the statement of Harris made to the sheriff that, though he drove the car, he did not actually rape the prosecuting witness. This might indicate that he was only an accessory, but the distinction between principals and accessories was abolished in this state in 1936. See Ark. Stat. Ann. § 41-118 (1947). Accordingly, even under this statement, if Harris were guilty, he was guilty as a principal."

The court also noted that the trial court had correctly limited the use of the statement, and that both Harris and Trotter received the same sentence, indicating that neither had been prejudiced as against the other by the statement.

Thus, the instant case presents facts identical in important respects to *Trotter.* Appellants "were charged with the same offense, which grew out of the same occurrence." Although Campbell's statement did deny any involvement in the rapes, as did the statement in *Trotter,* this denial had no effect on his guilt as a principal. The trial court likewise limited the use of the statement against the co-defendants, and all appellants did, in fact, receive the same sentence. Under the *Trotter* standard, therefore, no conflict of interest has been shown.

This conclusion is in accordance with the overwhelming majority of courts that have ruled upon the issue — *i.e.,* the record must show some material basis for an alleged conflict of interest, before reversible error occurs in single representation of co-defendants.[1] In a particularly definitive case, *United*

---

[1] In *American-Canadian Oil and Drilling Corp.* v. *Aldridge and Stroud,* 237 Ark. 407, 373 S.W. 2d 148, this court expressly held that a mere possibility of conflicting interest does not disqualify an attorney *per se.* The court stated:
> "A mere possibility that different interests represented by an attorney might develop a conflict is not sufficient to disqualify him."
The court held that the interests must be actually adverse.

*States* v. *Williams,* 429 F. 2d 158, *cert. denied,* 400 U.S. 947, the Eighth Circuit stated:

> "It has been firmly established that joint representation of codefendants is not *per se* violative of the Sixth Amendment. [Citations omitted.] Expressed another way, no reversible error is committed by the district court in assigning a single attorney to represent two or more codefendants in a pending criminal action, absent evidence of an actual conflict of interest or evidence pointing to a substantial possibility of a conflict of interest between the codefendants. [Citations omitted.] Where courts have found such evidence on the appellate record, they have not hesitated to direct a reversal for a new trial. [Citations omitted.]
>
> ". . .[T]here is nothing pointing to an actual or substantial possibility of a conflict of interest between appellant and his codefendant, Brinkley. We need go no further. A reversal here would be tantamount to a holding that joint representation is illegal *per se* , a result not mandated by the Sixth Amendment, *Glassen* [v. *United States,* 315 U. S. 60], or its progeny."

Similarly, in *United States* v. *Gallagher,* 437 F. 2d 1191, the Seventh Circuit, confronted with the same argument, found no conflict of interest, and stated:

> "The existence of a conflict of interest, to warrant [reversal], must be founded on something more than mere speculation or surmise. We perceive nothing in this record which demonstrates the existence of any real conflict of interest between the defendants."

Research discloses at least thirty-two jurisdictions that adhere to this standard, requiring some factual demonstration of a conflict of interest.

By contrast, a small minority of jurisdictions (five) appear to have adopted a much more liberal standard first applied by the District of Columbia Court of Appeals in *United States* v. *Lollar,* 376 F. 2d 243. Under the *Lollar* rule, the trial court bears the burden of investigating any potential

conflict of interest, and of determining the need for separate counsel, whenever any "informed speculation" of conflict exists. Although this rule was first announced almost a decade ago, very few jurisdictions have found it persuasive. For example, in *United States ex rel. Robinson* v. *Housewright,* 525 F. 2d 988 (Nov. 26, 1975), the Seventh Circuit expressly rejected the *Lollar* standard for appointment of separate counsel. That court stated that "the primary responsibility for the ascertainment and avoidance of conflict situations must lie with the members of the bar," and that "it is incumbent upon the defendants to demonstrate, with a reasonable degree of specificity, that a conflict of interests actually existed at trial." Likewise, in *State* v. *Jeffrey,* 515 P. 2d 364, the Montana Supreme Court refused to adopt the *Lollar* rule, adhering instead to the majority requirement "that there be a showing of a conflict of interest to the prejudice of the accused, and that this conflict must be more than a mere conjecture as to what might have been shown."

Although this court referred to the "informed speculation" rule when reversing a conviction in *Shelton* v. *State,* 254 Ark. 815, 496 S.W. 2d 419, it cannot be presumed that *Shelton* overruled *Trotter and Harris* v. *State, supra.* In fact, the *Shelton* opinion does not discuss, or even mention *Trotter.* In *Shelton,* there were no co-defendants. A witness, Joe Hilderbrand, had been a defendant but the case against him had been dismissed. It was contemplated that the state might call Hilderbrand as a witness and counsel for Shelton stated that he had represented Hilderbrand, had received confidential information from him, and would not feel free in cross-examining Hilderbrand if he were called to testify. A principal difference in that case and the one at bar is that Shelton never did take the stand and testify.

A recent case, *United States* v. *Jeffers,* 520 F. 2d 1256 (7th Cir.), *cert. denied,* 96 S. Ct. 805 (Jan. 13, 1976), discusses the proper procedure to be followed when an alleged conflict of interest may arise because counsel possesses confidential information. The opinion was written by Justice (then Judge) John Paul Stevens. In *Jeffers,* counsel for multiple defendants asserted that he was unable to fully cross-examine a prosecution witness whom his law firm had previously represented. Counsel alleged that because of this prior representation, he

was in possession of confidential information that created a conflict of interest, limiting his effectiveness in representing the *Jeffers* defendants. He requested that the trial court permit him to withdraw from the case because of the presumed conflict. The trial court held, however, that no actual showing of a conflict had been made, and that therefore counsel would not be permitted to withdraw.

On appeal of the ensuing convictions, the Seventh Circuit in *Jeffers* approved the trial court's ruling. Judge Stevens first noted that counsel "made no effort to disclose the privileged information to the court *in camera* to enable the court to evaluate its relevance." Reviewing the scope of the attorney-client relationship, the court further stated that "[t]he risk that an item of confidential information might be misused does not create a conflict of interest which disqualifies an attorney from conducting any cross-examination at all." The court concluded:

> "Thus, if defense counsel was concerned that he might be using confidential information improperly, he could have outlined the nature of the information to the judge and, if necessary, made an *in camera* disclosure to him. On the basis of such a disclosure it might have become apparent that the privilege was either inapplicable or had been waived by the witness. Or, it might have been clear that the information was not usable for other evidentiary reasons."

In the instant case, no disclosure of the nature of the information acquired was outlined to the judge. After all, without any reflection on present counsel, a very honorable man and competent lawyer, requiring the granting of a motion to appoint separate counsel purely on the basis of a motion stating that confidential information had been received from the defendants, might well eventuate in an imposition on the court and could result in the mandatory appointment of additional counsel in every case where multiple defendants were involved; the contingencies set forth in *Jeffers* might well dispose of the issue.

Summarizing, a review of the record establishes that no prejudice resulted, in fact, to appellants. As the state correct-

ly points out, all three appellants voluntarily took the stand, *against* the advice of counsel, and denied any involvement in the crime. Most important, however, *none* of the appellants attempted to incriminate any of the others. Campbell completely denied making the statement to the officers, and denied even knowing Holloway at all. Holloway and Welch both stated that they knew nothing about the case. Thus, the actual testimony adduced at trial by appellants presented no conflict of interest whatsoever. Accordingly, the record presents no basis from which this court can find that separate counsel should have been appointed. This conclusion agrees with the holdings of other courts in similar fact situations. *People* v. *Spencer*, 206 N.W. 2d 733 (Mich. App.); *Davis* v. *State*, 201 S.E. 2d 345 (Ga. App.).

Appellants assert that the trial court erred by admitting into evidence the "rights waiver" allegedly signed by Campbell, and the oral statement allegedly made by him to police. Campbell denied signing the form and making the statement, contending that he was under the influence of alcohol and narcotics at the time.

In reviewing a trial court's ruling on the admissibility of a statement, this court makes an independent determination based on the totality of the evidence, but reverses the trial court only when its ruling is clearly against the preponderance of the evidence. *Degler* v. *State*, 257 Ark. 388, 517 S.W. 2d 515. The ruling of the trial court in the instant case clearly is not against the preponderance of the evidence. Both officers who were present during Campbell's interrogation testified that he was not visibly under the influence of drugs or alcohol, that he could walk and talk normally, and appeared sober. Both officers said that they could smell alcohol on Campbell, and gave him a "breathalyzer" test, but that Campbell's mental faculties were not apparently impaired. The conflicting testimony posed an issue of credibility for the trial court, and from the appellate record it cannot be said that error was committed in admitting the rights form and oral statement.

Appellants argue that the trial court erred by refusing to allow their counsel to ask one of the officers who had interrogated Campbell about the statutory presumption on

blood alcohol content. The officer testified that a "breathalyzer" test given to Campbell "showed that he registered point 16 percent blood alcohol." Appellants' counsel then asked, "And what is the percentage reading for a drunk?" The trial court at that point sustained the state's objection to the question.

The *prima facie* presumption of intoxication set forth in Ark. Stat. Ann. § 75-1031.1 (Repl. 1957) applies solely to individuals who are charged with the offense of driving a vehicle while intoxicated. As the state points out, the statute is relevant solely to the issue of an individual's ability to drive safely — his reactions, coordination, and capacity to operate an automobile. Appellants cite no authority that a statute with such a limited purpose should be applied to the vastly different issue of a defendant's mental ability to comprehend his constitutional rights and to give a statement. To the contrary, see *Wilson v. Coston,* 239 Ark. 515, 390 S.W. 2d 445; *Hoffman v. State,* 70 N.W. 2d 314 (Neb.); *People v. Leis,* 213 N.Y.S. 2d 138; *State v. Aarhus,* 128 N.W. 2d 881 (S.D.) The argument, we think, is untenable.

Finally, it is asserted that "The court erred in permitting officers to testify that they took a picture of defendant, Campbell, and a warrant for his arrest when they went to the jail to talk to a man by the name of Robert Hill." During the examination of Jerry Best, one of the officers who had questioned Campbell, Best testified that he and Plummer had taken "a picture of Campbell and a warrant that we had for him" when they went to retrieve him from the detention center.[2] Appellants' counsel objected and requested a mistrial, which the trial court denied. Appellants contend that the refusal of a mistrial was error, because the officer's testimony allegedly created "an impression to the jury that it was a mug shot of the defendant and could lead them to believe that he had a long record."

---

[2]Officer Plummer had received information that a man who had given his name as Robert Hill was being held in the detention center, but that "Hill" was actually Gary Don Campbell. Campbell had been previously convicted of an offense and the officers took his picture to the detention center as a matter of being positive that "Hill" and Campbell were one and the same.

It must be noted that the officer used the word, "picture," and made no reference to a "mug shot." The word used by the officer seems in no way prejudicial to appellants; further, no request was made for an admonition to the jury. The applicable standard is stated in *Gammel and Spann* v. *State*, 259 Ark. 96, 531 S.W. 2d 474:

> "Declaring a mistrial is an extreme remedy which should be granted only where there has been an error so prejudicial that justice could not be served by continuation of the trial. [Citation omitted.] It should not be granted when any possible prejudice could be removed by an admonition to the jury. [Citation omitted.] It certainly was not called for in this case. Appellants did not seek an admonition to the jury to disregard the questions or any of their implications."

Still further, Plummer had already earlier testified to the same facts without objection, and any possible error would be rendered harmless.

All objections made during the trial by appellants have been examined and found to contain no merit. Finding no reversible error on the whole case, the judgment is affirmed.

It is so ordered.

GEORGE ROSE SMITH, FOGLEMAN and BYRD, JJ., dissent.

CONLEY BYRD, Justice, dissenting. I would reverse this case because the trial court forced the public defender to represent all three defendants after he, in accordance with American Bar Association Standards For Criminal Justice, The Defense Function § 3.5(a)(1971), informed the court that, because of a confidential communication from his clients, there was a conflict of interest among them. The record with respect to the conflict issue shows the following:

> "MR. HALL: At this time I would like to renew that motion on the ground that one or two of the defendants may testify and, if they do, then I will not be able to cross-examine them because I have received confidential information from them.

THE COURT: I don't know why you wouldn't. Overruled. Save your exceptions.

. . .

MR. HALL: I am in a position now where I am more or less muzzled as to any cross-examination.

THE COURT: You have no right to cross-examine your own witness.

MR. HALL: Or to examine them.

THE COURT: You have a right to examine them, but you have no right to cross-examine them. The prosecuting attorney does that.

MR. HALL: If one takes the stand, somebody needs to protect the other two's interest while that one is testifying, and I can't do that since I have talked to each one individually.

\* \* \*

THE COURT: You are overruled. Each defendant said he wants to testify, and there will be no cross-examination of these witnesses, just a direct examination by you."

The record shows that all defendants testified in their own behalf. The following took place when the defendant, Welch, testified:

"DEFENDANT HOLLOWAY: Your Honor, are we allowed to make an objection?

THE COURT: No, sir. Your counsel will take care of any objections.

MR. HALL: Your Honor, that is what I am trying to say. I can't cross-examine them.

THE COURT: You proceed like I tell you to, Mr. Hall.

You have no right to cross-examine your own witnesses anyway."

The oath administered to lawyers when they receive their license to practice law before this court requires each lawyer to affirmatively answer that "I will maintain the confidence and preserve inviolate the secrets of my client. . . ." Disciplinary Rules DR 4-101(B) of the Code of Professional Responsibility, adopted by this court provides:

"(B) Except when permitted under DR 4-101(C), a lawyer shall not knowingly:

(1) Reveal a confidence or secret of his client.

(2) Use a confidence or secret of his client to the disadvantage of the client.

(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure."

In the American Bar Association Project on Minimum Standards for Criminal Justice, Providing Defense Services, we find the following with reference to the professional independence of appointed defense counsel.

"1.4 Professional independence.
    The plan should be designed to guarantee the relationship between lawyer and client. The plan and the lawyers serving under it should be free from political influence and should be subject to judicial supervision only in the same manner and to the same extent as are lawyers in private practice. One means for assuring this independence, regardless of the type of system adopted, is to place the ultimate authority and responsibility for the operation of the plan in a board of trustees. Where an assigned counsel system is selected, it should be governed by such a board. The board should have the power to establish general policy for the operation of the plan, consistent with these standards and in keeping with the standards of professional conduct. The board should be precluded from interfering in the conduct of

particular cases.

*Commentary*

a. Integrity of the professional relation

A system which does not guarantee the integrity of the professional relation is fundamentally deficient in that it fails to provide counsel who have the same freedom of action as the lawyer whom the person with sufficient means can retain. Inequalitites of this nature are seriously detrimental to the fulfillment of the goals of providing counsel. They are quickly perceived by those who are being provided representation and may encourage cynicism toward the justness of the legal system and, ultimately, of society itself. Much of the dispute concerning the merits of various systems has centered on their capacity to guarantee professional independence. The study made by the Special Committee of the Association of the Bar of the City of New York and the National Legal Aid Association concluded that the necessary independence could be guaranteed under any type of system, from public defender to assigned counsel, if and only if the system is properly insulated from pressures, whether they flow from an excess of benevolence or from less noble motivations. See EQUAL JUSTICE FOR THE ACCUSED 61, 67, 71, 74-75. The importance of assuring the undivided loyalty of defense counsel to his client has been emphasized in previously adopted standards."

To sustain its illogical position that "the record must show some material basis for an alleged conflict of interest, before reversible error occurs in single representation of co-defendants," the majority mistakenly rely upon *Trotter and Harris v. State,* 237 Ark. 820, 377 S.W. 2d 14 (1964); *United States v. Williams,* 429 F. 2d 158 (8th Cir. 1970); *United States v. Gallagher,* 437 F. 2d 1191 (7th Cir. 1971); *United States ex rel Robinson v. Housewright,* 525 F. 2d 988 (7th Cir. 1971); *State v. Jeffrey,* 163 Mont. 92, 515 P. 2d 364 (1973); and *United States v. Jeffers,* 520 F. 2d 1256 (7th Cir. 1975).

In *Trotter and Harris v. State, supra,* the issue was not rais-

ed in the trial court. The opinion points out that during an in camera hearing in the trial court to determine if Trotter and Harris should take the witness stand that both parties expressed their approval of appointed counsel and of his efforts during the trial. In the absence of any showing of a conflict in the record, this court properly held that there was no merit to the conflict of interest contention. In the case before us the objection was raised in the trial court and at every opportunity in keeping with the Code of Professional Conduct.

In *United States* v. *Williams, supra,* upon which the majority relies, the defendants were making a post-conviction attack upon their guilty pleas. The record there shows that both defendants had escaped from the Iowa prison at the same time and that they were arrested together. When they were brought before Judge Duncan for arraignment the appointed counsel raised the possibility of a conflict of interest. In doing so appointed counsel stated: "At this time, Your Honor, I know of no conflict but I am saying that the conflict may arise in the future." When Judge Duncan asked, "Is there anything, any statement that come from [the defendants] that indicates a conflict of interest?" The attorney responded, "Not at the present time." Thus the Eighth Circuit was correct in asserting that the post-conviction conflict of interest assertion was without merit. However, such holding is not authority for saying that a conflict arising from a confidential communication to appointed counsel should be denied when the matter is brought to the attention of the court before trial. In fact the very emphasis of the court to the proposition that the motion was not made upon a confidential communication would indicate that the court would require representation by different counsel should that situation arise.

In *United States* v. *Gallagher, supra,* the court had appointed separate counsel for each defendant. Subsequently, the defendants employed single counsel to represent both. When the evidence showed that one of the defendants was the dominant member of the conspiracy, the lawyer suggested to the court that he didn't know, "whether I should let Tom Gallagher go at this time and concentrate on the lack of evidence against Neil Gallagher or whether I should concentrate on the |evidence| against Neil and pound that in front of the jury." The court there pointed out that the existence of a

conflict of interest was left to only speculation and surmise. There was no contention in that case that the conflict arose from a confidential communication. In fact, it would appear that the motion was more in the nature of a defense ploy.

The majority's reliance upon *United States ex rel Robinson* v. *Housewright, supra,* is totally misplaced. There Robinson had entered a bargained plea of guilty to murder and received a reduced sentence. He sought to raise the conflict of interest of his appointed counsel in a post-conviction hearing. However, the appointed counsel testified that he knew of no conflict of interest. In pointing out that Robinson was entitled to no relief the court stated:

> ". . . The record discloses that the court appointed attorney had not ascertained the presence of a disabling conflict. Nor does anything suggest that he would not have brought to the attention of the court the existence of such a conflict. . . " [citing § 3.5(a) ABA Standards For Criminal Justice, supra.]

The majority's reliance upon *State* v. *Jeffry, supra,* is not supported by the facts there involved nor the reasoning of the Montana Court. Both defendants there were tried together and as pointed out by the court:

> "Both hired and retained the same counsel to represent them in all preliminary matters and at trial. Counsel was not appointed, or imposed upon either of them — he was retained by the defendants. Prior to this appeal neither of the defendants had claimed he was denied effective counsel, but now, after conviction, they each contend that since they were represented by the same counsel they each were denied their right to effective counsel."

The Montana Court first stated that in determining the conflict of interest issue, it followed the reasoning set forth in *Kruchten* v. *Eyesman,* 406 F. 2d 311 (9th Cir. 1969), which provides:

> "In considering the legal aspect of the conflict of interest claim, we start with the premise that if a conflict

of interest actually exists the court will not weigh or determine the degree of prejudice which may result before granting relief. *Glasser* v. *United States*, 315 U.S. 60, 62 S. Ct. 457, 86 L. Ed. 680 (1942). However, until an actual conflict is shown to exist or can be reasonably foreseen an attorney may, in good faith, represent both defendants."

The reason for denying relief when the conflict issue is raised for the first time on appeal was stated by the Montana Court as follows:

". . . The whole problem directs itself ultimately on appeal to the adequacy or inadequacy of defense counsel and in the eyes of this Court such adequacy or inadequacy of counsel should not be tested by the greater sophistication of appellate counsel who did not try the case, nor should the test be made on the basis of applying different defense tactics, perhaps of doubtful efficiency, after leisurely studying the transcript of the trial. . . ."

Of course in the case before us we have the statement of the Public Defender that a conflict would arise in the event the defendants took the witness stand in their own behalf. He made that statement because of confidential communications he had received from his clients.

Finally the majority make much of the fact that the now Justice John Paul Stevens wrote the opinion in *United States* v. *Jeffers*, 520 F. 2d 1256 (1976). That case does not even involve a conflict of interest arising from the representation of co-defendants. There retained counsel, Cohen of the law firm of Cohen & Thiros, represented a number of defendants termed "The Family" who were indicted for a "highly-structured and on-going narcotics distribution net work in Gary, Indiana." On the sixth day of trial the government brought forth as a witness one James Berry. At that time Cohen informed the court that Berry had previously been represented by one of his law partners in a prior state court homicide case. Cohen admitted that his law firm did not then represent Berry, that he did not personally know Berry, and that he personally had had no confidential communication from

Berry. Before concluding that no conflict of interest was shown that would effectively prevent the cross-examination of witness Berry, Judge Stevens emphasized:

> ". . . We also emphasize at the outset that this is not a case involving an existing personal relationship between Cohen and the witness Berry. Consequently, the numerous cases involving an on-going relationship between an adverse witness and a lawyer are inappropriate."

In a foot note following the above statement it is stated:

> "The courts have frequently held that the existence of such a relationship, with the inherent hesitancy of counsel to completely cross-examine a current client, creates a very real conflict of interest and requires a mistrial if the conflict is disclosed, or a new trial, if the conflict is discovered only later, see *Castillo* v. *Estelle,* 504 F. 2d 1243 (5th Cir. 1974), . . . "

Our own case of *Shelton* v. *State,* 254 Ark. 815, 496 S.W. 2d 419 (1973), falls in the category of the cases mentioned by Justice Stevens in the foot note, *supra.*

The majority's assertion that the Public Defender should tell all of his confidential communications to the trial judge to protect some of his clients could prove very embarrassing to the public defender's other clients if the jury should become hung on the amount of punishment and leave the punishment to be fixed by the trial court. Under the majority opinion appointed counsel can never maintain inviolate the confidence of his clients.

For the reasons stated I respectfully dissent.

GEORGE ROSE SMITH and FOGLEMAN, JJ., join in this dissent.